# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

DORA BUENROSTRO,
Defendant and Appellant.

S073823

Riverside County Superior Court
CR59617

December 3, 2018

Justice Kruger filed the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Mauro\* concurred.

---

\*     Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BUENROSTRO

S073823

Opinion of the Court by Kruger, J.

After a jury found defendant Dora Buenrostro competent to stand trial, a separate jury convicted her of the first degree murders of her children, Susana, Vicente, and Deidra. (Pen. Code, § 187.) The jury found true three multiple-murder special-circumstance allegations (*id.*, § 190.2, subd. (a)(3)) and allegations that defendant personally used a knife in the commission of each murder (*id.*, §§ 1192.7, subd. (c)(23), 12022, subd. (b)). After a penalty trial, the same jury returned a verdict of death. The trial court denied defendant's motion for a new trial and for modification of the verdict (*id.*, § 190.4, subd. (e)) and sentenced her to death. This appeal is automatic. (*Id.*, § 1239, subd. (b).)

We affirm the judgment as to guilt, vacate two of the three multiple-murder special-circumstance findings, reverse the judgment as to the sentence of death, and remand the matter for a new penalty determination.

## I. FACTS

### A. Guilt Phase

The bodies of the three victims were found on October 27, 1994. Each victim had suffered fatal stab wounds. Beginning on that date and continuing through her trial testimony, defendant blamed the murders on her estranged husband,

1

Alejandro Buenrostro (who was known as Alex). In closing argument, however, the defense conceded that Alex, who had an alibi, could not have killed the children. The guilt phase focused on whether there was sufficient evidence to establish that defendant committed the murders and did so willfully and with premeditation and deliberation.

### 1. Prosecution Evidence

Defendant and Alex were married in 1982. Until their separation several years later, they lived in Los Angeles with their three children, Susana, Vicente, and Deidra (ages nine, eight, and four, respectively, at the time of the murders). Alex worked as an auto refinisher painter, and defendant worked for seven years as a file clerk and interpreter for a law firm. In 1990, defendant moved with the children to San Jacinto in Riverside County. Alex remained at the Los Angeles residence and saw the children twice a month.

### a. Events of Tuesday, October 25, 1994

Between 5:00 and 6:30 p.m. on Tuesday, October 25, 1994, defendant was seen driving in her car with her three children. Around 6:30 p.m., defendant borrowed $10 from a neighbor, David Tijerina, for gasoline because she was going to drive to Los Angeles to see her husband. Tijerina watched defendant drive out of the apartment complex with Deidra in the car.

Defendant arrived at Alex's residence in Los Angeles, alone and unannounced, about 11:00 p.m. and stayed for two hours. She asked to see Alex's gun. He removed the bullets, showed her the gun, and then put it away. He asked defendant about the children, and she told him they were fine. At some point, defendant went to the kitchen and then approached Alex, who was in the bedroom. She was holding a steak knife and

wearing a red glove. She made stabbing motions with the knife and asked Alex why he was afraid of dying. She threatened to hit him where "it hurts the most" because he had "never given her our separation." He called 911. Defendant swung at him with the knife a couple of times, but he was able to get away and ran outside.

Police arrived within 20 minutes, at 1:15 a.m. Defendant was standing in the doorway of the residence, holding the knife, but complied when police commanded her to drop it. She told the police she was there to pick up her child, whom she accused Alex of taking to buy shoes earlier in the day and not returning. The police observed no children at the residence or in defendant's car, a dark-colored four-door Oldsmobile lacking a child's car seat. The police advised her to return to San Jacinto and file a missing child report, and she left.

b. *Events of Wednesday, October 26, 1994*

On Wednesday, October 26, 1994, about 10:30 a.m., defendant went to the San Jacinto Police Department and reported to Officer Blane Dillon that her estranged husband had taken her youngest child two days earlier and not brought her back. The officer informed her law enforcement could not intervene unless her husband was in violation of a court order providing he was not permitted to visit with the child. Defendant left the police department.

Later that day, about 2:00 p.m., defendant's sister, Angela Montenegro, saw her at a gas station in San Jacinto. Defendant was alone and driving her black Oldsmobile, which had been washed and had water dripping from the back bumper. Neither Deidra nor a child's car seat was in the car. About 3:00 p.m., defendant's next door neighbor, Velia Cabanila, saw Susana and

3

Vicente when they stopped briefly to play at her apartment after school. The children told Cabanila their mother had told them Deidra was with their father. Deidra had visited Cabanila's apartment the day before, by herself. About 7:00 p.m., another neighbor saw defendant looking over the wall of her apartment.

### c. Events of Thursday, October 27, 1994

Cabanila's and defendant's apartments shared a common wall. On Thursday, October 27, 1994, about 3:00 a.m., Cabanila heard a "really loud thump," but no other noise, coming from defendant's living room.

At 6:40 a.m., defendant entered the San Jacinto Police Department and reported to the desk clerk her husband was at her apartment with a knife. Police were immediately dispatched. The officers entered the apartment and found two of defendant's children, Susana and Vicente, lying on separate sofas in the living room, each covered as if sleeping. Both were dead, with stab wounds to their necks. Another sofa was standing on its end at the entrance to the hallway, blocking the path to the bedrooms and the bathroom. Defendant admitted she had moved the sofa.

Outside, defendant told police Alex had come to the apartment that morning. She let him in, and he went to the bathroom. Defendant thought he was acting strange, so she went to the police station to notify the police of his behavior.

San Jacinto Police Detective Sergeant Frederick Rodriguez was assigned as lead investigator. At the police station, he interviewed defendant, who was not in custody. Meanwhile, police focused their investigation on Alex. By 9:00 a.m., police located him at the office of his employer in Los Angeles and took him into police custody for questioning. By

early the next morning, the police ruled him out as a suspect and released him from custody.[2]

Later, around 6:00 p.m., Deidra's body was discovered by children playing in an abandoned post office in Lakeview. A deputy with the Riverside County Sheriff's Department responded to the scene and saw Deidra strapped in a child's car seat. There was blood and visible trauma to her mouth and neck. An object with a handle, possibly a screwdriver or pen knife, was stuck in her throat.

Officer Dillon arrived at the scene about 7:30 p.m. to investigate. He had received information about the investigation from other officers during the course of the day. Based on inconsistencies in defendant's versions of events, police focused on her as a suspect.[3]

### d. *Physical evidence*

Defendant's car was removed from her apartment complex and processed for evidence. Her purse and camera case and a red knit glove were discovered in the trunk of the car. DNA testing established that six blood samples obtained from

---

[2] Police spoke with Alex's neighbor, who confirmed (as she did at trial) she had heard his shower running the morning of Thursday, October 27, and saw him leave his residence about 7:20 a.m. Given the distance between defendant's apartment in San Jacinto and Alex's workplace in Los Angeles, as well as the time defendant reported Alex was at her apartment in possession of a knife (6:40 a.m.), Alex was ruled out as a suspect.

[3] Detective Rodriguez's interview of defendant began around 10:30 a.m., shortly after the bodies of Susana and Vicente were discovered in her apartment. A tape recording of the entire interview was played for the jurors. A transcript of the recording was also given to the jurors.

defendant's car matched Deidra's DNA profile. Defendant, Alex, Susana, and Vicente were eliminated as sources for the blood.

Hairs found on Deidra's hand and leg were determined to be similar to defendant's. Tire impressions lifted from an area near the abandoned post office where Deidra's body was found matched the tread designs of the three different types of tires on defendant's car.

### e. Autopsy results

All three children bled to death from multiple stab wounds to the neck. Susana suffered defensive wounds to her right hand; four stab wounds to the front of her neck, two of which went into the bone of her spine; superficial cuts to her neck; and a perforation of her left chest cavity. The stab wounds ranged in depth from one to three inches. One stab wound severed the left subclavian artery and another cut halfway through the external jugular vein. These two injuries caused exceedingly rapid bleeding and likely rendered Susana unconsciousness in less than a minute.

Vicente suffered numerous defensive wounds on his hands, two stab wounds to the front of his neck, and abrasions and contusions on his neck and right clavicle. One of the stab wounds cut almost completely through the right common carotid artery, which comes from the heart. Vicente died from rapid bleeding, which likely rendered him unconsciousness in less than a minute.

Deidra died from multiple stab wounds to her neck. A piece of a knife blade three-quarters of an inch wide by two to three inches in length had broken off and was embedded in the bone in her neck area. A metallic tip of what appeared to be a ballpoint pen was found in the soft tissue of her neck. Deidra

had suffered a perforation of the chest cavity and blunt force trauma to her skull, which was consistent with her head being slammed against the car seat while she was being stabbed. There were no defensive wounds on her body. Deidra's body exhibited signs of decomposition. The time of her death could not be determined.

### 2. *Defense Evidence*

Defendant testified in her own defense. On direct examination, she testified that the last time she saw Deidra was 9:00 or 10:00 a.m. on Tuesday, October 25, 1994, when Alex came to her apartment and took her. Between 11:00 a.m. and noon, defendant went to the San Jacinto Police Department to report Deidra missing. At 11:00 p.m. that night, defendant drove to Alex's residence in Los Angeles and checked the house for Deidra. She picked up a knife to defend herself during an argument with Alex. She threatened him but did not try to stab him, and she denied that she wore a red glove on her hand. Alex called the Los Angeles Police, and defendant dropped her knife when ordered to do so. She complained to police that Alex had taken Deidra and had not returned her. When the police advised her to leave, she left and returned to San Jacinto. The following morning, defendant went to the San Jacinto Police Department seeking assistance regarding Deidra's disappearance.

Defendant testified that at 5:00 a.m. on Thursday morning, October 27, 1994, Alex came to her apartment. When she let him in, he went straight to the bathroom. Defendant left the apartment because of the Tuesday evening altercation with him in Los Angeles. She left Susana and Vicente in the apartment. She arrived at the police department between 5:30

and 6:00 a.m., telling police she had had an argument with Alex on Tuesday and he had taken her daughter. She asked them to check her apartment and speak with Alex. Defendant said he did not have a knife or other weapon.

Defendant returned to her apartment complex with the police and waited outside. About 7:30 a.m., she was informed her children were dead. Defendant went to the police department, where she remained all day for questioning. She denied killing the children, claiming someone had planted the blood evidence in her car. She had no explanation for the tire impressions that matched the tires on her car and said the red gloves found in the passenger compartment and trunk of her car belonged to a Betty Buenrostro. Defendant admitted having a prior felony conviction for grand theft.

## B. Penalty Phase

### 1. Prosecution Evidence

The prosecution presented evidence of defendant's prior conviction for grand theft, her violent conduct while incarcerated, and the impact of the murders on the victims' family members and on the community.

#### a. Prior felony convictions (Pen. Code, § 190.3, factor (c))

The parties stipulated that defendant pleaded guilty to felony grand theft (Pen. Code, § 487.1) on September 1, 1988.

#### b. Prior unadjudicated criminal activity involving the use of or express or implied threat to use force or violence (Pen. Code, § 190.3, factor (b))

In February 1995, while awaiting trial in this case, defendant had a physical altercation with Deputy Johnnie Anaya and a nurse who was administering medications to

inmates housed on the medical floor in the jail. The altercation occurred when defendant stepped outside her cell, refused an order to return to her cell, and raised her hand to the deputy and nurse. Defendant grabbed the nurse's arm and, when her hand slipped, held tightly onto her sleeve. Anaya forced defendant back into her cell. The deputy and defendant struggled, fell to the floor, and struggled further before other deputies subdued defendant.[4]

Another incident occurred in May 1996. Deputy Stephanie Rigby was supervising inmates at the jail and permitted defendant to leave the day room. Defendant walked into a sally port area and removed a wringer from a custodial mop bucket. Observing her from a glass-enclosed control room, Deputy Rigby commanded her to return to the day room. Defendant refused to comply and held the mop wringer over her shoulder like a baseball bat. When she refused to drop the wringer, back-up deputies were called to assist. A deputy had to physically remove the wringer from her grip. Defendant did not attempt to hit any of the deputies with the wringer.[5]

### c. Victim impact testimony

The prosecution presented the testimony of the victims' older half-sister, Alejandra Buenrostro, their father, Alex Buenrostro, and Deborah De Forge, the principal of the

---

[4]    The trial court ruled evidence of the incident admissible under Penal Code section 190.3, factor (b), as showing a battery (*id.*, § 242) involving the express or implied use of force or violence, or the threat of force or violence.

[5]    The trial court ruled the incident admissible under Penal Code section 190.3, factor (b), as misdemeanor exhibiting a deadly weapon in a threatening manner (*id.*, § 417).

elementary school Susana and Vicente attended. The prosecution played a videotape of Alex at the police station showing the moment he learned Susana and Vicente had been murdered. The prosecution also presented a video montage of photographs of the victims in life and their shared gravesite.

### 2. *Defense Evidence*

Defendant testified on her own behalf, claiming she had been framed by police in general and Officer Blane Dillon in particular, whom she accused of having lied about the timeline of events and planting the incriminating evidence in her car. In her view, the expert had testified the hairs found on Deidra could have belonged to anyone. She denied being mentally ill. Defendant maintained her innocence of the charges and wanted to be sentenced to life without the possibility of parole because she had been framed.

The defense also presented testimony from defendant's former neighbor David Tijerina, niece Brenda Davalos, and sisters Martha Gudino and Maria Perez and their mother, Arcelia Zamudio. The evidence briefly sketched defendant's family background, portrayed her as a loving mother, and related a change in her attitude and behavior in the months preceding the murders. Defendant's family members asked for mercy.

## II. COMPETENCY PROCEEDINGS

### A. Factual and Procedural Background

Before trial, the trial court declared a doubt as to defendant's competence to stand trial and suspended the criminal proceedings under Penal Code section 1368 for a competency determination. The question was submitted to a

jury. At the competency trial, defense experts — psychologists Michael Perrotti and Michael Kania and psychiatrist Mark Mills — testified that defendant was not competent to stand trial. Court-appointed experts — psychiatrist Jose Moral and psychologist Craig Rath — testified that she was competent. The jury found defendant competent to stand trial.

### 1. Defense Evidence

#### a. Psychologist Michael Perrotti

Psychologist Michael Perrotti, Ph.D., spent 10 hours administering psychological tests and evaluating defendant in March and July 1995.

Defendant related to Dr. Perrotti that she had a ninth grade education and had been physically abused by her husband. Regarding her current circumstances, defendant reported that "everyone was against her," jail deputies conspired against her, she was being poisoned by a gas leak in her jail cell, she was hearing voices and acting aggressively to the point that she had to be handcuffed, and the medical staff at the jail was conducting experiments on her for research purposes. Defendant appeared depressed and confused. Her thoughts were disorganized and her speech pressured. She suffered from significant impairment of memory and concentration caused by a mental disorder, and Dr. Perrotti believed there was "a possibility of a neuro-psychological problem." Dr. Perrotti did not perform neuropsychological testing because defendant would not cooperate.

Dr. Perrotti opined defendant did not understand the legal system and had no insight into her lack of understanding. Everything with defendant was "clouded with suspicion, distrust, and [beliefs that] people are acting against her," all of

which hindered her ability to work with her attorney or any attorney. Defendant was aware of the murder charges against her but denied knowing who the victims were. She wanted to go to court so she could be released and return home.

Dr. Perrotti diagnosed defendant as a paranoid schizophrenic. He did not include this diagnosis in his written report because he believed a description of defendant's behavior and her "problems" was easier to understand than a diagnostic label, and had not used the label "paranoid schizophrenic" with regard to defendant except with trial counsel. Over the course of Dr. Perrotti's evaluation of defendant, trial counsel would occasionally ask him, "Do you think [defendant's] schizophrenic?" He admitted that his diagnosis of defendant as a paranoid schizophrenic did not necessarily mean that she was incompetent. Based on the test results, Dr. Perrotti found no signs defendant was malingering.

### b. *Psychologist Michael Kania*

Psychologist Michael Kania, Ph.D., met with defendant on six or seven occasions before he evaluated her for competency during his visits on March 3 and April 17, 1995. He administered the Minnesota Multiphasic Personality Inventory (MMPI) on December 17, 1994. Dr. Kania explained that although this psychological test is not relevant to the issue of competency, a determination of malingering can be made based on a comparison of the test results to the clinician's impressions. Dr. Kania found no evidence defendant malingered on the MMPI. He acknowledged defendant's scores had been evaluated by Dr. Alex Caldwell's testing service, which produced a report stating her answers suggested "extensive intentional overstatement" and "some degree of deliberate malingering."

The report also included a warning to use caution in interpreting defendant's test results because she did not answer all items.

Based on his interviews with defendant, Dr. Kania diagnosed her as suffering from delusional disorder with paranoid delusions. For example, defendant thought her sister spoke a different language and had been influencing her children in this language. Defendant also believed gas was being pumped into her jail cell. He concluded she was incompetent to stand trial; although she understood the nature of the charges against her and had a basic understanding of the legal proceedings, she could not rationally assist counsel.

### c. Psychiatrist Mark Mills

Psychiatrist Mark Mills, M.D., met with defendant on November 16, 1994, and April 27, 1995, for a total of two hours. He questioned whether she had been forthcoming during the interviews and believed she may have been "paranoid but hiding symptoms." Defendant discussed her delusions with family members and others, but refused to talk with him about them. He diagnosed her as suffering from "a significant psychotic disorder, probably a delusional disorder." Because her diagnosis rendered her unable to work rationally with any attorney, he believed her to be incompetent to stand trial.[6]

### d. Psychiatrist Herminio Academia

On February 26, 1995, Riverside County Mental Health Department staff psychiatrist Herminio Academia, M.D.,

---

[6] Dr. Mills explained that although he did not explicitly state in his report that defendant was incompetent, he did so impliedly.

treated defendant at the jail for about 20 minutes. Defendant was complaining her cell was too hot, she was being "cooked," and "gas was going to her cell." Dr. Academia diagnosed defendant with a nonspecific psychotic disorder and prescribed Haldol to relieve her delusions and paranoia, but she refused the medication.

### e. Psychiatrist Austin Anthony

On February 27, 1995, Riverside County Department of Mental Health staff psychiatrist Austin Anthony, M.D., treated defendant. She spoke in a rambling manner about the room being hot and about the smell of gas. She appeared friendly and cooperative and had good eye contact, but on occasion seemed confused and bewildered. She refused to take medication prescribed for her. On February 28, 1995, Dr. Anthony's last appointment with defendant, he found her to be friendly and alert and no longer complaining of the gas smell.

### f. Testimony of defendant's family members and Regena Acosta

Defendant's sisters Angela Montenegro, Martha Gudino, and Maria Perez described her delusions and bizarre behavior. For example, Montenegro testified that in July 1994, when she and her two children were living with defendant and her three children, defendant came home from church one day and took the tacos the children were eating, threw them in the garbage, and told Montenegro to move out. On several occasions during the next month, defendant accused Montenegro of feeding defendant's children poisoned taco meat, being a witch, and turning into a snake and biting her (defendant's) leg. On cross-examination, Montenegro testified she and defendant had attended the same church, and the church asked her

14

(Montenegro) to quit attending services because of a relationship she had with a man named Roberto. Defendant accused Montenegro of being a prostitute. Montenegro told the police that defendant's anger and name-calling might have had something to do with Roberto.

Gudino visited defendant at the jail with their other sister, Perez, and their mother. Trial counsel was also present during the visit and asked Gudino to persuade defendant to sign medical information release authorization forms for any medical provider who treated defendant during her life. For about an hour and 45 minutes, Gudino, Perez, and their mother tried to persuade defendant to sign the forms. She refused and told her family that they were against her.

Regena Acosta read about defendant in the newspapers after the murders. She was motivated to minister to defendant and visited her in jail four or five times between about November 1994 and February 1995. Acosta testified defendant told her she believed the jail guards were putting "stuff" in her food to make her sick. Defendant also told Acosta she did not understand what was going on at court.

### 2. Prosecution Evidence

#### a. Court-Appointed Psychiatrist Jose Moral

On March 25, 1995, court-appointed psychiatrist Jose Moral, M.D., examined defendant at the jail. She was alert and oriented and understood the purpose of his visit. She knew she had been charged with murdering her three children. She demonstrated knowledge and understanding of the criminal legal process, including the various stages from arrest through trial and sentencing. Before having her children, she had been employed at a civil law firm as an assistant to the legal

secretaries and worked with attorneys for about seven years. Defendant complained the proceedings were progressing too slowly. She denied having delusions or hallucinations and exhibited no psychotic symptoms during the interview.

On July 26, 1995, Dr. Moral interviewed defendant a second time. Defendant again demonstrated knowledge of the legal system. Her relationship with counsel had improved by this time. She explained that her preoccupation with the smell of gas in her cell stemmed from news reports about deaths in Riverside caused by exposure to gas fumes. She denied having the psychotic symptoms reported by other psychologists and psychiatrists and gave Dr. Moral reasonable explanations for the reported symptoms. Defendant had no thought disorder. She was able to carry out her interview with Dr. Moral without difficulty and was "purposeful in her answers," "cooperative," "reasonable," and "logical." Dr. Moral believed defendant was competent to stand trial. During a break in the proceedings on the day he testified, Dr. Moral interacted with defendant and discussed competency issues with her. After this contact, Dr. Moral continued to believe defendant was competent to stand trial.

### b. Court-Appointed Psychologist Craig Rath

Psychologist Craig Rath, Ph.D., was appointed on March 14, 1995, to evaluate defendant's competence to stand trial. Previously, on October 28, 1994, at the request of the Riverside District Attorney's Office, Dr. Rath had interviewed defendant

for about an hour after her arrest.[7]  He taped the interview, and the audiotape was played for the jury in its entirety.[8] Defendant's demeanor during the interview was appropriate. She exhibited no signs of mental illness or psychosis putting her "out of contact with reality."  Defendant's long-term and short-term memory were unimpaired.  She communicated very well and protected information she did not want to share.

Dr. Rath administered the MMPI to defendant.  She completed 400 of 566 questions.  Her answers showed a "saw-tooth profile," which is a classic sign of malingering.

After Dr. Rath was appointed by the court to evaluate defendant's competency, he unsuccessfully attempted to evaluate defendant on March 24, 1995, and April 3, 1995.[9] Based on his October 28, 1994, interview with her shortly after the murders, Dr. Rath believed she was competent to stand trial because she "does not have any major mental illness [that] would preclude her from understanding what's going on or cooperating with her attorney."

Although Dr. Rath had first interviewed defendant shortly after her arrest, at the request of the District Attorney's office, he did not declare a conflict when the court appointed him on March 14, 1995, to render an opinion as to her competence to

---

[7]    Defendant had waived her right against self-incrimination and agreed to speak to a "doctor."

[8]    The jury was also given a copy of the transcript of the interview.

[9]    On his first attempt, deputies at the jail informed Dr. Rath defendant had refused to be handcuffed, which was required when she was transported outside her cell because she "had been attacking people."   When he returned to evaluate defendant in April, she refused to see him.

stand trial. Dr. Rath denied he had a conflict under the Board of Medical Quality Assurance Ethics Committee's standards. He testified he had contacted the committee and was told he had not acted unethically. Regarding his initial visit with defendant, Dr. Rath pointed out it would have been unethical for him to refuse to see her, given she was potentially suicidal after the deaths of her three children.

### c. *Jail Psychiatrist Romeo Villar*

Between October 28, 1994, and March 1, 1995, jail psychiatrist Romeo Villar, M.D., saw defendant several times while she was in custody. During his last contact with her in March 1995, defendant denied having hallucinations or suicidal ideations. Dr. Villar testified defendant had fair insight and judgment, and her affect was subdued.

### 3. *Defense Rebuttal Evidence*

Catherine Moreno, a paralegal employed by trial counsel, had had contact with defendant approximately 10 times by the time she testified at the competency trial. Moreno testified that defendant could not structure coherent paragraphs, although Moreno could not recall ever having read anything written by defendant. Moreno had never tried to talk with defendant about the facts of her case. Defendant refused Moreno's numerous requests to sign forms to authorize the release of information and failed to provide any explanation. Moreno acknowledged she could have obtained the documents with a subpoena.

Sherry Skidmore, Ph.D., a clinical and forensic psychologist, had served on local, state, and national psychological ethics committees. She reviewed the results of the MMPI test Dr. Rath administered to defendant. Based on those scores, Dr. Skidmore could not render an opinion as to whether

or not defendant was malingering. In her opinion, no psychologist would determine malingering from MMPI results alone. A determination of malingering depends on a number of objective measures, including a follow-up interview to clarify specific parts of the malingering assessment, such as distortion and over-reporting of symptoms. For a forensic psychologist to render an opinion regarding an individual's competence based on an interview not conducted for the purpose of determining competence would fall below the standard of care.

### 4. Surrebuttal

On October 27, 1995, George Groth, a mental health clinician at the jail, saw defendant at her request. Defendant was anxious about her upcoming trial. Groth found defendant's thinking clear and her speech understandable, and she exhibited no signs of mental illness. The parties stipulated this was the only time defendant was seen by the jail's Forensic Mental Health unit between September 1, 1995, and the day her competency trial commenced, October 26, 1995.

The parties also stipulated that on November 1, 1995, a search warrant was served in defendant's jail cell. Two documents written by defendant in Spanish were confiscated during the search.[10]

---

[10] Additional details concerning the two documents are provided in part II.B.4., *post*.

## B. Discussion

### 1. Constitutionality of the Definition of Incompetence to Stand Trial Under Penal Code Section 1367, Subdivision (a), and CALJIC No. 4.10

The due process guarantees of both the federal and state Constitutions forbid the trial of a criminal defendant while he or she is mentally incompetent. (See *People v. Mickel* (2016) 2 Cal.5th 181, 194–195.) In California, the determination whether a criminal defendant is competent to stand trial is governed by Penal Code section 1367 (section 1367), which provides that a defendant is mentally incompetent "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) Consistent with that standard, the jury in this case was instructed with CALJIC No. 4.10 (Doubt of Present Mental Competence), which informed the jury that its task was to "decide whether the defendant is mentally competent to be tried for a criminal offense," and went on to explain: "Although on some subjects her mind may be deranged or unsound, a person charged with a criminal offense is deemed mentally competent to be tried for the crime charged against her if, one, she is capable of understanding the nature and purpose of the proceedings against her; two, she comprehends her own status and condition in reference to such proceedings; and, three, she is able to assist her attorney in conducting her defense in a rational manner. [¶] The defendant is presumed to be mentally competent. The effect of this presumption is to place upon the defendant the burden of proving by a preponderance of the evidence that she is mentally incompetent as a result of a mental disorder."

Defendant contends that the statutory definition of mental competence in section 1367 is inadequate to safeguard a defendant's due process rights because it requires proof that a mental disorder or developmental disability rendered the defendant unable to understand the proceedings against him or her or to assist counsel with his or her defense. She also contends that both the statutory definition and CALJIC No. 4.10 are inadequate because they fail to require proof of (a) both a "rational" and a "factual" understanding of the criminal proceedings, and (b) a "present" ability to assist counsel in a rational manner. She contends these infirmities, separately and together, violated her right to substantive due process under the Fourteenth Amendment and require reversal of the entire judgment. Defendant's contentions lack merit.

### a. Legal background

As a matter of due process, "[a] defendant may not be put to trial unless he ' "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." ' " (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354, quoting *Dusky v. United States* (1960) 362 U.S. 402, 402 (per curiam) (*Dusky*).) A trial court's failure "to employ procedures to protect against trial of an incompetent defendant deprives him of his due process right to a fair trial and requires reversal of his conviction." (*People v. Medina* (1990) 51 Cal.3d 870, 881–882, citing *Drope v. Missouri* (1975) 420 U.S. 162, 171 (*Drope*).) " 'Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' [Citation.] State constitutional authority is to

the same effect. [Citation.]" (*People v. Lightsey* (2012) 54 Cal.4th 668, 690–691 (*Lightsey*).)

"The applicable state statutes essentially parallel the state and federal constitutional directives." (*Lightsey*, *supra*, 54 Cal.4th at p. 691.) Section 1367, subdivision (a), provides in pertinent part: "A person cannot be tried or adjudged to punishment . . . while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

Penal Code section 1368 (section 1368) provides in relevant part: "(a) If, during the pendency of an action and prior to judgment . . . , a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time. [¶] (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to [Penal Code] Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is

mentally competent, the court may nevertheless order a hearing."

"[A] trial court is obligated to conduct a full competency hearing if substantial evidence raises a reasonable doubt that a criminal defendant may be incompetent. This is true even if the evidence creating that doubt is presented by the defense or if the sum of the evidence is in conflict. The failure to conduct a hearing despite the presence of such substantial evidence is reversible error." (*Lightsey*, *supra*, 54 Cal.4th 691, citing *People v. Welch* (1999) 20 Cal.4th 701, 737–738.)

The law presumes a person is competent to stand trial. (Pen. Code, § 1369, subd. (f).) "When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence." (*People v. Mendoza* (2016) 62 Cal.4th 856, 871; see § 1369, subd. (f); *Medina v. California* (1992) 505 U.S. 437, 446 (*Medina*) [allocation of the burden of proof to a criminal defendant to prove incompetence does not violate procedural due process].)

### b. *Penal Code section 1367's requirement of proof of mental disorder or developmental disability*

Defendant contends that the definition of mental incompetence under section 1367, subdivision (a), fails to meet the constitutional standard because it requires proof of a mental disorder or developmental disability. She contends that United States Supreme Court decisions, by contrast, have defined competence to stand trial solely in the functional terms of a defendant's ability to understand the nature of the proceedings against her and to assist her attorney in preparing her defense in a rational manner. (See *Dusky*, *supra*, 362 U.S. at p. 402;

*Drope, supra,* 420 U.S. at p. 171.) She contends that section 1367's requirement of proof of a mental disorder or developmental disability unconstitutionally narrows the definition of incompetence, thereby depriving a "subset of defendants"—those who are unable to understand the proceedings and assist counsel in a rational manner but do not "suffer from a recognized mental disorder or developmental disability"—of the right not to be tried while incompetent.

In her briefing, defendant did not specify whether her claim relates to the facial validity of section 1367, subdivision (a), or the statute's validity as applied to the particular circumstances of her case. At oral argument, however, appellate counsel clarified that defendant's challenge is a facial attack. " ' "To support a determination of facial unconstitutionality, . . . [challengers] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute." ' " (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) Rather, the "minimum" our cases have accepted is a showing that the statute is invalid "in the *generality* or *great majority* of cases." (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 673; cf. *Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 449 [noting that while some justices of the high court have embraced a more demanding standard, all justices "agree that a facial challenge must fail where the statute has a ' "plainly legitimate sweep" ' "].)

In this case, defendant has failed to demonstrate that section 1367, subdivision (a), is facially invalid; indeed, she has failed to identify any case (including her own) in which section 1367's mental disorder or developmental disability requirement

results in the violation of due process.[11]   Contrary to her argument, the due process right not to be tried while incompetent has long been understood in terms of the causal relationship between the defendant's mental condition and his or her trial-related functional abilities.   As the high court explained in *Drope*, the constitutional right is rooted in the venerable common law rule "that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." (*Drope*, *supra*, 420 U.S. at p. 171.)

Section 1367, like many other similar statutes in other jurisdictions, thus articulates a causal relationship between the existence of a mental disorder and functional impairments.[12]

---

[11]   When pressed at oral argument, appellate counsel posited a scenario in which a defendant does not understand the nature of the proceedings because of cultural differences, as opposed to a mental disorder or developmental disability.   But cultural differences alone do not give rise to a *lack of capacity* to understand the nature of the proceedings or assist counsel in preparing a defense, as the *Dusky* standard requires.

[12]   When the statute was first enacted in 1872, section 1367 provided:  "A person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane."  Case law interpreting the provision established that, though a defendant may have claimed to be "deranged or unsound," he was not "insane" for purposes of section 1367 unless he could not understand the nature and object of the proceedings against him and could not aid his counsel to conduct his defense in a rational manner. (*People v. Perry* (1939) 14 Cal.2d 387, 397, 399.)  In 1974, the Legislature amended the statute to codify this standard, substituting the term "mentally incompetent" for "insane."  (Assem. Com. on Criminal Justice, Ex Post Facto

(See, e.g., 18 U.S.C. § 4241(d) [federal statute forbidding trial of a defendant found to be "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"].)  The statutory language reflects a view that, "[a]s a matter of law and logic," incompetence to stand trial "must arise from a mental disorder or developmental disability that limits his or her ability to understand the nature of the proceedings and to assist counsel."  (*Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 860.)  On this view, "[a] defendant who refuses to work with his lawyer out of spite alone is not incompetent," for example, "even if that defendant has a serious mental disease or defect."  (*United States v. Garza* (9th Cir. 2014) 751 F.3d 1130, 1136.)

The high court's cases cast no doubt on the constitutionality of this approach.  On the contrary, that court has characterized a state statute establishing procedures to determine whether a person " 'as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense' " as facially "adequate to protect a defendant's right not to be tried while legally incompetent." (*Drope, supra,* 420 U.S. at p. 173.)  And the court has since consistently referred to the incompetence inquiry under *Dusky* as one that focuses on the defendant's mental condition and capacity. (See, e.g., *Godinez v. Moran* (1993) 509 U.S. 389, 401, fn. 12 (*Moran*); see also, e.g., *Medina, supra,* 505 U.S. at p. 450 [at a competency hearing, "psychiatric evidence is brought to

_____

Analysis of Assem. Bill. No. 1529 (1973 Reg. Sess.) June 12, 1973, pp. 3–6; Stats. 1974, ch. 1511, § 2, eff. Sept. 27, 1974.)

bear on the question of the defendant's mental condition"].) Defendant has offered no sound basis to conclude that this focus is inconsistent with due process.

To the extent defendant means instead to argue that the *Dusky* standard does not require a specific medical diagnosis drawn from the current version of the Diagnostic and Statistical Manual of Mental Disorders, we do not disagree. But neither does section 1367 impose this sort of requirement. Although this statute requires that the defendant show that, because of a mental disorder or developmental disability, he or she is unable to understand the nature of the proceedings or to rationally assist in his or her own defense, it does not require that the defendant's mental disorder fit neatly within the standard diagnostic taxonomy. We find no inconsistency with *Dusky*.

> c. *Asserted omission of certain elements from Penal Code section 1367's definition of competence to stand trial and CALJIC No. 4.10*

Defendant next contends that the definition of competence in section 1367 and in CALJIC No. 4.10 omit necessary elements from the standard articulated in *Dusky, supra,* 362 U.S. 402 and thus fails to satisfy due process requirements. Under *Dusky*, a defendant is competent to stand trial if he or she " 'has sufficient *present* ability to consult with his [or her] lawyer with a reasonable degree of rational understanding' " and " 'has *a rational as well as factual* understanding of the proceedings against him [or her].' " (*Id.* at p. 402, italics added.) Defendant argues that section 1367 and CALJIC No. 4.10 omit the requirements of "a rational as well as factual" understanding of the proceedings and a "present" ability to rationally assist counsel. She contends the jury should be instructed that a defendant's understanding of the proceedings "must be based on

reason, as opposed to delusion, fantasy or some other non-reality based perception" and encompass the ability to comprehend facts. She also contends the instructions should require the jury to determine the defendant has a "present, already-existing ability," as opposed to mere "potential capacity," to rationally assist an attorney in conducting a defense.

In response to similar arguments, "[w]e have previously observed that the language of section 1367, from which CALJIC No. 4.10 is drawn, 'does not match, word for word, that of *Dusky*. But as the Court of Appeal noted in *James H. v. Superior Court* (1978) 77 Cal.App.3d 169, 177, "To anyone but a hairsplitting semanticist, the two tests are identical." ' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 808.) What we have said before applies equally in this case. The United States Supreme Court has itself articulated the standard for competency in terms similar to those in section 1367 and CALJIC No. 4.10. (*Moran*, *supra*, 509 U.S. at p. 402 ["Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel."].) Neither section 1367 nor the instruction is infirm merely because it fails to focus specifically on the defendant's "rational and factual" understanding of the proceedings, as opposed to focusing on the defendant's understanding of the proceedings more generally; we agree with the Attorney General that "one's ability to grasp the nature of the proceedings necessarily encompasses one's capacity to have a rational and factual understanding of the proceedings."

Nor is the statute or instruction flawed because it fails to refer to the defendant's "present" ability to assist counsel. Both the statute and instruction are already phrased in the present tense, and the statutory scheme makes amply clear that the

mental competence inquiry focuses on the defendant's present abilities, as opposed to the possibility that the relevant abilities may be restored in the future. (See Pen. Code, § 1370, subd. (a)(1)(B).) To the extent defendant contends that the point should have been made even clearer to the jury, she made no such argument in the trial court and therefore has forfeited any objection she might have had to the omission of the term "present ability" from CALJIC No. 4.10. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 876–877 (*Covarrubias*).)

### 2. *Exclusion of Psychologist Sherry Skidmore's Rebuttal Testimony*

Defendant contends that the trial court erroneously excluded rebuttal testimony from defense psychologist Dr. Sherry Skidmore. The testimony was offered to impeach Dr. Rath's testimony concerning his evaluation of defendant's competence to stand trial (see Pen. Code, § 1369, subd. (d)). Specifically, Dr. Skidmore would have testified that: (1) Dr. Rath's conclusion that defendant was competent to stand trial was invalid under professional standards because he did not conduct an evaluation for the purpose of determining competence, and (2) Dr. Rath had a conflict of interest because he was originally referred by the District Attorney to interview defendant on the day of her arrest and before the court appointed him to evaluate defendant's competence. Defendant asserts that the erroneous exclusion of Dr. Skidmore's testimony violated her state and federal constitutional rights to due process, a fair trial, confrontation, compulsory process, and to present evidence in support of her case (Cal. Const., art. I, §§ 15, 16; U.S. Const., 6th & 14th Amends.), and was

prejudicial, requiring reversal of the entire judgment.[13]   The claim lacks merit.

### a. Factual and procedural background

Clinical psychologist Craig Rath, Ph.D., testified for the prosecution that he interviewed defendant and administered the MMPI on October 28, 1994, the day of her arrest for the murders.  Defendant had waived her *Miranda*[14] rights and had agreed to speak to a doctor.  The purpose of the interview was to evaluate defendant for possible suicide risk and to gather

---

[13]   In this claim and most others on appeal, defendant contends the asserted error or misconduct she raises infringed various of her state and federal constitutional rights to a fair and reliable trial.  What we said in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17, is equally applicable here:  "In most instances, insofar as defendant raised the issue at all in the trial court, [s]he failed explicitly to make some or all of the constitutional arguments [s]he now advances.  In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution.  To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.]  [¶]  In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well.  No separate constitutional discussion is required in such cases, and we therefore provide none."

[14]   *Miranda v. Arizona* (1966) 384 U.S. 436.

information "for possible later use in court for one side or the other."

On March 14, 1995, without objection by the defense, the trial court appointed Dr. Rath to evaluate defendant's competence to stand trial. (See Pen. Code, §§ 1368, 1369, subd. (a).) Defendant refused to meet with Dr. Rath after his appointment. Based on his October 28, 1994, interview of defendant and the results of the MMPI, Dr. Rath opined defendant was competent to stand trial and did not have "any major mental illness which would preclude her from understanding what's going on or cooperating with her attorney." Dr. Rath also opined defendant's MMPI results showed a classic profile for malingering.

On cross-examination, defense counsel attempted to impeach Dr. Rath by establishing that: (1) his evaluation of defendant on the day of her arrest, October 28, 1994, was not a competency evaluation under section 1368 because he did not interview her for that purpose; and (2) his agreement to interview defendant for the District Attorney shortly after her arrest created a potential conflict of interest he was required to disclose when the trial court later appointed him to conduct a competency evaluation.

Dr. Rath denied there were any ethical problems with the services he rendered. He also testified that defendant demonstrated no mental illness during the October 28 interview and that her behavior at that time appeared to be "all volitional." He therefore considered her competent to stand trial and did not ask her specific questions about her knowledge and understanding of court proceedings. When counsel attempted to place Dr. Rath's ethics in issue because he relied on

information he gathered during the October 28 interview and testing, neither of which were for the purpose of evaluating competency, the expert explained he included the circumstances of his interview in his written report.

Counsel also asked Dr. Rath whether his inability to interview defendant in March and April 1995, after his court appointment, potentially affected the reliability of his opinion that she was competent to stand trial. Dr. Rath testified he would have been able to elaborate more but thought his opinion would remain unchanged. Counsel then asked Dr. Rath about an ethical standard prohibiting a psychologist from offering evidence about an individual's psychological characteristics when the psychologist has not had "an opportunity to conduct an examination of the individual adequate to the scope of the statements, opinions or conclusions to be issued" and requiring psychologists to make "clear the impact of such limitations on the reliability and validity" of their testimony.[15] Dr. Rath agreed that no expert should "go beyond the scope of his database" and claimed he satisfied this ethical requirement by "outlining exactly what the database is and whatever limitations there might be." Dr. Rath explained that in his report concerning defendant, he "clearly stated how much [he] had seen her and when [he] had not seen her. . . ."

Dr. Rath agreed with counsel the American Psychological Association (APA) Guidelines contained in the APA's Ethical Handbook governed his professional conduct. Counsel asked whether he was obligated to comply with the standard directing that "[f]orensic psychologists avoid providing professional

---

[15] Counsel did not provide a citation to the ethical standard he purportedly was quoting.

services to parties in a legal proceeding with whom they have personal or professional relationships that are inconsistent with the anticipated relationship." Dr. Rath identified the quoted standard as having been taken from the Division 41 Guidelines for Forensic Psychologists, which he said had been rejected by the APA and the California licensing board as unclear and ambiguous. He denied that his having interviewed defendant for the District Attorney before his court appointment for the competency evaluation amounted to a conflict of interest. Dr. Rath testified that he had contacted the Board of Medical Quality Assurance Ethics Committee and had been told "there [was] no conflict."

Counsel then asked Dr. Rath whether he had complied with the APA guidelines requiring disclosure to the parties of those factors that "might reasonably affect the decision to contract with the forensic psychologist[]," including "prior and current personal or professional activities, obligations, and relationships that might produce a conflict of interest." Dr. Rath repeated that there was no conflict of interest. Counsel asked Dr. Rath whether the APA guidelines required him to obtain consent from defendant or her counsel before conducting his October 28 interview, given that the interview was not court ordered. Dr. Rath explained that because defendant had no attorney at that time and had waived her *Miranda* rights, there was no violation of the APA guidelines.

On recross-examination, counsel sought to further question Dr. Rath about his ethical obligations, and the prosecutor objected on grounds of scope and relevance. The trial court sustained the objection, stating, "We have covered this ethics thing completely" and "[w]e are done talking about ethics."

Outside the presence of the jury and before the prosecution rested its case, trial counsel sought permission to present testimony by forensic psychologist Sherry Skidmore, Ph.D., to rebut Dr. Rath's testimony concerning a psychologist's ethical obligations. Specifically, Dr. Skidmore would have testified that: (1) Dr. Rath's competency evaluation was governed by ethical principles that he denied were applicable; (2) "it is unethical and scientifically invalid to reach a conclusion on the question of competency when [Dr. Rath] never actually interviewed [defendant] and performed a specific competency evaluation"; and (3) under professional standards for forensic psychologists, Dr. Rath had a conflict of interest because he interviewed defendant on October 28 at the request of the District Attorney before he was appointed by the court to evaluate her competency, and was required to "make certain disclosures." Counsel argued Dr. Skidmore's proffered testimony was proper rebuttal because the jury had no evidence other than Dr. Rath's own testimony on which to base its determination whether Dr. Rath acted ethically.

The prosecutor objected on the basis the proffered testimony was collateral and excludable under Evidence Code section 352. The court sustained the objection, agreeing the proffered testimony was collateral and noting, "Dr. Rath is not on trial[,]" and "I allowed [defense counsel] to inquire into the ethical situation as Dr. Rath understood it, and [he] did and now we are done with that." The court permitted counsel to introduce Dr. Skidmore's testimony refuting Dr. Rath's interpretation of defendant's MMPI test results.

In rebuttal, Dr. Skidmore testified she had specialized experience in the areas of professional ethics and on scoring and evaluating MMPI tests. She testified that a psychologist acts

below the standard of care by rendering an opinion on competence to stand trial based on an interview conducted for a purpose other than determining competence. When the defense inquired whether a forensic psychologist could reach a valid conclusion if, at the time of the interview, he or she was working "in a dual role," the court sustained the prosecution's objection before Dr. Skidmore answered.

### b. Discussion

In competency proceedings, each party may offer evidence to rebut evidence offered by the other side. (Pen. Code, § 1369, subd. (d).) Evidence bearing on the credibility of a witness is generally relevant, and therefore admissible, in such a proceeding. (Evid. Code, §§ 210, 350.)

"As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) The court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Such rulings are reviewed for abuse of discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070; see *People v. Young* (2005) 34 Cal.4th 1149, 1199.)

Although the trial court characterized Dr. Skidmore's proffered testimony as "collateral," the testimony was unquestionably relevant: Because professional psychologists and psychiatrists are permitted to render an opinion on the ultimate issue of the defendant's competence, their adherence to or disregard of professional standards in forming those opinions

is relevant to their credibility as experts. The question here is whether the trial court appropriately weighed the probative value of the testimony against the probability that its admission would necessitate undue consumption of time, under Evidence Code section 352. We ultimately need not answer the question, however, because even if we were to assume for the sake of argument that the trial court abused its discretion in excluding the evidence, any such error was clearly harmless.

Dr. Skidmore would have testified that Dr. Rath violated professional ethical standards for a forensic psychologist because his evaluation of defendant's competence to stand trial was based on an interview not designed for the purpose of evaluating competence to stand trial. She also would have testified that Dr. Rath had a conflict of interest when he was appointed to evaluate defendant's competence because before his appointment it was the prosecution that initially engaged him to interview her. As defendant emphasizes, the trial court's limitation on Dr. Skidmore's testimony had the effect of precluding the jury from hearing from any expert, other than Dr. Rath himself, regarding relevant professional ethical standards for forensic psychologists.

Ultimately, however, the circumstances of Dr. Rath's prearrest examination and its limits on assessing competency were fully litigated, despite the limitation on the defense's rebuttal evidence. In response to defense questioning, Dr. Rath himself agreed that no expert should "go beyond the scope of his data base." As Dr. Rath also noted, his report had explained how much he had seen defendant and his failures to meet with her following his court appointment. Further, the jury heard testimony from Dr. Skidmore that (1) it is "below the standard of care" for a forensic psychologist to render an opinion about an

individual's competence to stand trial when the individual was not interviewed for that purpose,[16] and (2) it is unethical for a psychologist to form an opinion about malingering based on the limited information provided by MMPI results.

Despite this evidence, as well as the testimony of two defense experts opining that defendant was incompetent, the jury was unconvinced. Other evidence, including the writings taken from her cell, tended to show that defendant could communicate coherently and that she understood the nature of the proceedings against her. There is no reasonable probability that the jury would have reached a different conclusion had the defense been permitted to offer further rebuttal evidence to counter Dr. Rath's claim that he accepted his court appointment without breaching any ethical rules or creating a conflict of interest. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

---

[16] On appeal, defendant for the first time suggests Dr. Skidmore's testimony on this topic was incomplete because she "did not explain why a valid opinion about competence requires a specific kind of interview, did not describe the requirements for such a particularized interview, and did not explain why Dr. Rath's investigative interview did not meet the professional standards for a competency interview." Trial counsel's proffer did not include these specifics, and the trial court was never made aware of the testimony defendant now asserts was omitted from counsel's proffer. (See *People v. Vines* (2011) 51 Cal.4th 830, 868–869 [a reviewing court "may not reverse a judgment for the erroneous exclusion of evidence unless '[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means.' (Evid. Code, § 354, subd. (a).)"].) To the extent defendant claims the trial court erred by excluding the testimony, the issue is not properly before us. (*People v. Livaditis* (1992) 2 Cal.4th 759, 780.)

Assuming defendant has preserved a claim of federal constitutional error, and the error implicated federal constitutional rights, we conclude the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

### 3. *Exclusion of Portions of Defense Expert Testimony*

During the defense case, the trial court excluded Dr. Kania's testimony about defendant's delusions regarding computers and Dr. Mills's testimony about the Caldwell testing service report on the results of the MMPI that Dr. Rath administered to defendant on the day of her arrest. Defendant offered these portions of the experts' testimony to support their opinions defendant was not competent to stand trial. The court excluded the testimony because the defense did not timely provide discovery of the evidence to the prosecutor. Defendant asserts that the court erroneously applied the criminal discovery statutes (Pen. Code, § 1054 et seq.) in excluding the evidence. She contends that the provisions of the Civil Discovery Act of 1986 (Civil Discovery Act or Act)[17] governed her competency proceeding, and that there was no violation of those provisions. Exclusion of the evidence, she asserts, was prejudicial error and denied her state and federal constitutional rights to due process

---

[17] Effective July 1, 2005, the Civil Discovery Act of 1986 (Code Civ. Proc., §§ 2016–2036) was repealed and reenacted without substantive changes by the Civil Discovery Act of 2004 (*id.*, § 2016.010 et seq.). (Stats. 2004, ch. 182, § 61; see also Cal. Law Revision Com. com. to § 2016; *Lee v. Superior Court* (2009) 177 Cal.App.4th 1108, 1123, fn. 2.) Defendant refers to the repealed provisions of the 1986 Act because they were in effect at the time of her competency trial. For convenience, we, too, refer to the repealed provisions of the 1986 Act effective at the time of defendant's competency trial.

and a fair competency trial, to present evidence in support of her case, and to contest the prosecution's case. The claim lacks merit.

## a. Factual and procedural background

### i. Dr. Kania

During cross-examination, the prosecutor questioned Dr. Kania extensively regarding defendant's delusions. On redirect examination, trial counsel asked Dr. Kania about his discussions with defendant regarding her delusional belief concerning computers. Dr. Kania said defendant had stated that computers were running the world and killing people, and that she did not know whether the people she saw were alive or were computers. The prosecutor objected to the line of questioning on the ground it was beyond the scope of cross-examination and it was "all new information" that had "never been [included] anywhere in a report or anything." The court permitted trial counsel to reopen his examination on this topic, and the prosecutor again objected he had not been provided discovery. The court asked counsel whether discovery of this particular delusion had been disclosed to the prosecutor. When counsel responded that it did not appear in Dr. Kania's report, the court sustained the prosecution's objection and struck the portion of the expert's testimony relating to defendant's computer delusions. The court admonished the jury to disregard the testimony.

### ii. Dr. Mills

During direct examination, Dr. Mills opined that defendant was not malingering and suffered from a psychotic disorder hindering her ability to work with an attorney. Trial counsel then asked whether he had reviewed the results of an

MMPI administered to defendant by the prosecution's expert, Dr. Rath. Outside the presence of the jury, the prosecutor objected to Dr. Mills's testimony on the ground he was unaware that Dr. Mills had sent Dr. Rath's raw data to the Caldwell testing service for evaluation; Dr. Mills's report made no mention of this information or an opinion based on the test data. The prosecutor stated he had received no discovery on this particular issue.

The court allowed trial counsel to question Dr. Mills outside the jury's presence. Dr. Mills testified both he and Dr. Kania sent Dr. Rath's MMPI results to Caldwell and had each received a report from Caldwell. Dr. Mills explained that, while there were slight differences between the reports he and Dr. Kania received, "for all practical purposes, they say the same thing." Counsel explained he sought admission of the Caldwell report sent to Dr. Mills because Dr. Mills had relied on the report in reaching his opinion. Counsel also asserted the report sent to Dr. Mills was not "new material" because the prosecutor "had the copy of the report from [Dr.] Kania." Finding that counsel had failed to provide discovery of Dr. Mills's testimony concerning the Caldwell report, the court excluded the testimony.

### b. Discussion

Defendant contends that the trial court erred in sustaining the prosecutor's objections and in excluding portions of Dr. Kania's and Dr. Mills's testimony as sanctions for discovery violations. Because a competency proceeding under section 1368 is a special proceeding and not a criminal action (*People v. Hill* (1967) 67 Cal.2d 105, 114, fn. 3), she reasons, civil discovery rules apply rather than the criminal discovery statute.

(See Code Civ. Proc., former § 2016, subd. (b)(1).) In support, she relies on *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 490–491, decided after her competency trial, which held that the Civil Discovery Act applies to competency hearings. Defendant argues that because the prosecutor did not comply with the civil rules for seeking discovery from her expert witnesses, in that he did not make a demand for the production "of all discoverable reports and writings" made by a designated expert in the course of preparing his or her opinion (Code Civ. Proc., former § 2034, subds. (a)(3), (g)), there was no basis for an order excluding the evidence for noncompliance with the Act's requirements. Absent a discovery violation under the Act, defendant contends, the court abused its discretion in excluding Dr. Kania's testimony about her computer-related delusions and Dr. Mills's testimony about the Caldwell report concerning the MMPI test results Dr. Rath obtained.

The Attorney General, citing *People v. Anderson* (2001) 25 Cal.4th 543, 592, footnote 17, and *People v. Williams* (1997) 16 Cal.4th 153, 250, argues preliminarily that defendant's claim under the Act is forfeited on appeal because she did not rely on the prosecutor's alleged noncompliance with the Act in opposing the objections at trial. Further, the Attorney General contends the trial court properly relied on the criminal discovery statutes in ruling on the prosecutor's objection because no objection was made concerning their applicability and the state of the law was unsettled. (Cf. *In re Scott* (2003) 29 Cal.4th 783, 813–814 [although the criminal discovery statute did not apply in a habeas corpus proceeding, the superior court judge logically cited the statute in crafting an order for limited discovery].) The Attorney General argues the court properly excluded the evidence under Penal Code section 1054.5, subdivision (c),

because the defense failed to disclose the "statements of experts made in connection with the case" and the results of the mental examination as required by Penal Code section 1054.3, subdivision (a)(1), of the criminal discovery provisions. Finally, the Attorney General contends that, even assuming error, defendant suffered no prejudice because the excluded evidence was cumulative.

We need not decide whether the Act or the criminal discovery statutes applied to defendant's competency trial. Even assuming the court's ruling excluding portions of Dr. Kania's and Dr. Mills's testimony constituted an abuse of discretion, the error was harmless under the "miscarriage of justice" standard for state law error under *Watson*, *supra*, 46 Cal.2d at page 836.

The court's ruling precluded the jury from considering Dr. Kania's testimony relating to defendant's purported delusional beliefs about computers and Dr. Mills's explanation of his reliance on the Caldwell analysis of Dr. Rath's MMPI test results. Defendant offered the evidence in support of each expert's opinion that defendant was incompetent to stand trial. The evidence was, however, cumulative of other testimony concerning defendant's delusions. Dr. Kania himself testified the primary symptom of defendant's psychotic disorder was her delusions. According to Dr. Kania, during his interviews with defendant, she expressed delusional beliefs that her sister was speaking a different language and influencing defendant's children in this language, that gas was being pumped into her cell, and that people were trying to physically harm her and kill her with the gas.

Dr. Perrotti similarly testified defendant had expressed delusional beliefs that she was being made the subject of a medical experiment, that people wanted to harm her, and that there was gas in her cell. In addition, Regena Acosta, who befriended defendant in jail, testified that defendant believed staff at the jail cafeteria put "stuff" in her food to make her sick. Defendant's family members also testified about her delusions, including, for example, her belief that her sister Angela Montenegro fed defendant's children poisoned meat and that Montenegro was a witch.

Defendant argues, however, that Dr. Perrotti's testimony concerning defendant's delusion about gas being pumped into her cell was not as persuasive as, and "did not compensate" for the exclusion of, Dr. Kania's testimony because Dr. Perrotti observed the delusion only once. She also asserts that the other evidence concerning her delusions came primarily from family members "whose impartiality the prosecutor called into question" and thus would not have been as persuasive as Dr. Kania's account of her computer delusion. The jury, however, heard ample evidence of defendant's delusional beliefs from a variety of sources. We see no reasonable probability that exclusion of Dr. Kania's testimony about defendant's particular delusional beliefs regarding computers affected the outcome of the proceedings. Defendant also fails to show that exclusion of the evidence, even if erroneous under state law, rendered her competency proceeding fundamentally unfair or otherwise violated her due process rights.

Regarding the exclusion of Dr. Mills's testimony, trial counsel represented that the expert's testimony would be essentially the same as Dr. Kania's on this point because each expert had submitted the results of Dr. Rath's MMPI to

43

Caldwell for evaluation and each had received similar reports from the testing service. During the hearing on the prosecutor's objection, Dr. Mills testified that the reports he and Dr. Kania received from Caldwell "for all practical purposes, . . . say the same thing." At trial, Dr. Kania compared the Caldwell interpretations of the results of the MMPI tests he and Dr. Rath administered separately to defendant.[18] Under these circumstances, testimony by Dr. Mills similar to Dr. Kania's testimony on the same subject would have added little, if anything, to the weight of the evidence of incompetence. Defendant therefore was not prejudiced by exclusion of Dr. Mills's testimony concerning the Caldwell report (*Watson*, *supra*, 46 Cal.2d at p. 836) and she does not otherwise show that exclusion of the evidence resulted in a fundamentally unfair competency proceeding or violated her right to due process.

### 4. *Admission of Defendant's Jailhouse Writings*

Defendant contends that the trial court abused its discretion by admitting certain jailhouse writings in the prosecution's surrebuttal case. The prosecution introduced the writings, which had been seized during a search of defendant's jail cell the previous week, to refute defense investigator Catherine Moreno's rebuttal testimony that defendant could not communicate coherently. Defendant argues that the writings were improper surrebuttal because: (1) her inability to converse coherently was at issue throughout the defense case-in-chief,

---

[18] Among other things, Dr. Kania testified defendant's MMPI results on the test he administered did not indicate malingering, but he acknowledged that the Caldwell report indicated that the results obtained by Dr. Rath suggested otherwise.

meaning the prosecution should have offered the writings during its case-in-chief; and (2) the prosecutor had indicated he would not introduce the writings. Defendant contends that admission of the writings deprived her of her state and federal constitutional rights to due process and a fair competency trial. We reject the argument.

### a. Procedural background

During defendant's rebuttal, defense paralegal Catherine Moreno testified that she had visited with defendant about 10 times during the previous year in an effort to get her to cooperate with the defense team. Moreno had four or five conversations with defendant about witnesses in her case and found her to be unhelpful, incoherent, and unable to stay on topic.[19] On cross-examination, Moreno testified she had never read any of defendant's writings.

Later the same day, and outside the presence of the jury, the prosecutor informed the court that defendant's jail cell had been searched the previous week and writings had been seized, copies of which had been provided to counsel. The prosecutor stated: "I have been debating back and forth, and I am still not convinced this second, but I think I would like to introduce the writings that we found in her cell to the jury. [¶] The only hesitancy I have is, the majority of it is in Spanish, and I don't know how the Court would feel about them getting a document that somebody's going to need to interpret."

---

[19] Trial counsel asked Moreno, "Have [your conversations with defendant] been coherent on the part of [defendant]?" and "have you observed whether or not [defendant]'s able to structure coherent paragraphs?"

The court responded: "[W]hen . . . there is something written in a different language, it's translated, and then the translated version is what is utilized[.]" The court expressed its reluctance "to send a document in Spanish into a jury. There may be some people who are fluent in Spanish, there may be some partially fluent. You don't want to do that because you don't know what is going to be the result." The prosecutor responded, "All right. That's fine. I will pass." The court said, "All right. Let's bring our jurors in. I propose at this point we will just end for the day and start the arguments on Monday."

Trial was adjourned until Monday, November 13, 1995. On that date, the last day of the competency trial, the prosecutor revisited the issue of the writings seized from defendant's jail cell. He represented that the writings had been translated over the weekend by a certified interpreter, and he offered the translations, copies of which had been provided to counsel, to demonstrate defendant's ability to write and form paragraphs and sentences. The court described one document as "three pages of translation attached to a number of pages that are in Spanish. The English portion here . . . [is] labeled, 'Another 48-Hour Appointment With Death,' and, just perusing this in general, it appears to be a story, and it appears to be a story that closely parallels [defendant's]." The court described the second document as a one-page handwritten document in Spanish, the English translation of which comprised defendant's "thoughts and/or prayers on behalf of the defendant dealing with this case."

Trial counsel objected to admission of the writings on the grounds the evidence should have been presented in the prosecution's case-in-chief and because the prosecutor had indicated in the prior proceeding he would not offer the evidence.

The court ruled: "[W]e did not close [as] to evidence. I did indicate we were going to leave it open for a ruling on People's 10 [jail records]. During the trial the seizure of this documentation was brought up. [The prosecutor] mentioned last week it was in Spanish. I mentioned to him last week, 'How do you intend to introduce it, it is written in some Spanish, we can't have the jurors translate it, we will have to have a translator translate the information.' He did not indicate, necessarily, he intended to introduce it, it was considered, it was considered for purposes of introduction as evidence. [¶] I clearly remember that because I remember [thinking], 'Isn't that interesting, how are we going to go ahead with documents in Spanish when, obviously, they haven't been translated?' So, you are not going to be successful with an objection on those bases."

When the court asked trial counsel whether he had any objection to the contents of the writings, counsel repeated that at the previous proceeding, the prosecutor had indicated he would not offer the writings. The court stated: "I agree with you, the last thing we had was [People's Exhibit] 10; however, we did not close [as] to evidence. It is not a surprise, we did discuss the information. I indicated I am not going to keep it out on that basis." The court granted trial counsel 15 minutes to review the pages and object to their content. Trial counsel stated he wanted to consult with his experts "to see what, if any, change this would make in their diagnosis [*sic*]." The following colloquy then occurred:

"THE COURT: Wait a minute. [¶] The way the trial proceeds, you go first, he goes next, you rebut, he rebuts. We are at his rebuttal. Do you have some authority that says you get a second rebuttal?

"[TRIAL COUNSEL]: Well, I think in this instance, yes; not case authority, but this goes well beyond simply being rebuttal, this is much more in the nature of a case in chief. It isn't something that occurred over the weekend.

"THE COURT: You offered the testimony of Ms. Moreno from your office, who testified on rebuttal that your client could not form paragraphs, that she couldn't put thoughts together and hold them together. Just perusing this, it clearly seems to rebut that presentation by you. [¶] Now, if you don't have any authority for a second rebuttal, that ends the issue here on that basis."

When trial counsel did not provide additional authorities, the court indicated that it would recess to give counsel an opportunity to read the translated writings and make any further objections. After the recess, the court confirmed counsel had read the writings and asked if he had anything further. Counsel responded, "I have nothing additional." The parties stipulated that the writings were confiscated during a search of defendant's jail cell, and the court admitted the writings and translations.

### b. Discussion

Penal Code section 1369 specifies the order of proof in a competency trial. First, defense counsel offers evidence in support of the allegation of mental incompetence (*id.*, subd. (b)(1)); next, the prosecution presents its evidence on the issue of the defendant's present mental competence (*id.*, subd. (c)); finally, "[e]ach party may offer rebutting testimony, unless the court, for good reason in furtherance of justice, also permits other evidence in support of the original contention" (*id.*, subd. (d)). Beyond these specifications, the order of proof is generally

within the court's discretion.  (Evid. Code, § 320.)  We review a trial court's ruling as to the order of proof for abuse of discretion.  (See *People v. Tafoya* (2007) 42 Cal.4th 147, 175.)

Defendant argues that evidence of her writings was not admissible as surrebuttal evidence because it should have been introduced during the prosecution's case-in-chief, given that it was relevant to the prosecution's case and already in its possession.[20]  We disagree.

During the defense case-in-chief, several witnesses, including Dr. Perrotti, jail nurse Terrill, and Dr. Mills testified that at times defendant did not express herself coherently.  During its case-in-chief, the prosecution had introduced evidence to the opposite effect, including, for example, Dr. Moral's testimony that defendant could effectively communicate about her family, medical, and mental health history and "keep in touch with [him] verbally, talking back and forth, without difficulty."  In rebuttal, to counter the prosecution's evidence that defendant could communicate

---

[20]  Defendant also argues that "the prosecutor did not establish that the writings seized from [defendant]'s cell reflected her *present* ability to communicate coherently" because "[t]he documents were undated and could have been written at any time during the year between [her] arrest and their admission at trial."  At trial, however, defendant did not object to the admissibility of the evidence on this ground, thereby forfeiting this objection.  In any event, the writings were relevant to show defendant's ability to communicate during the period before trial, as to which defense paralegal Moreno had also testified.  Defendant's concern that the writings may not have been made during or *immediately* before trial goes to the weight of the evidence, not its admissibility.

effectively and without difficulty, defense paralegal Moreno testified that defendant could not converse or structure paragraphs coherently. The prosecutor offered defendant's writings in surrebuttal to refute Moreno's rebuttal testimony. This was not improper. (Pen. Code, § 1369, subd. (d).)

Defendant argues that the prosecution should have offered the writings in its case-in-chief because this issue was material to its case and already in its possession. But the same is true of defense witness Moreno's rebuttal testimony that defendant could not communicate coherently; that testimony was likewise material to defendant's case-in-chief and already in her possession, but not offered until after the defense and prosecution had each presented its case-in-chief. Under the circumstances, the trial court did not abuse its discretion in permitting the prosecution to rebut Moreno's testimony with defendant's writings.

Further, the record does not support defendant's contention that admission of the writings at the end of trial improperly allowed the prosecution to place undue emphasis on them. The writings were addressed only briefly during the parties' closing arguments. The prosecutor asked jurors to consider all the evidence in deciding whether defendant was competent, telling them, among other things: "[t]here is some evidence you have not seen . . . the notes we had translated from her jail cell, took [*sic*] about two weeks ago," which they should "[r]ead . . . [and] make [your] own decisions as to how well she can think or not think, the cleverness, the detail, the subtleties." The prosecutor also argued that the writings demonstrated defendant understood the nature of the legal proceedings against her. Defense counsel countered that jurors should accord the writings little weight because they were not

introduced earlier or given to the doctors who interviewed defendant. Nothing in the record suggests that the prosecution placed undue emphasis on the late-introduced writings.

Finally, contrary to defendant's assertion, the trial court's ruling did not allow the prosecutor to "sandbag" the defense. The prosecution's argument that the writings showed defendant was able to communicate coherently in writing did not inject an entirely new subject into the trial at the last moment. Defense paralegal Moreno's rebuttal testimony that defendant could not communicate coherently related to events in the previous year. Further, the writings were not available until about a week before the prosecutor first indicated he might want to introduce them. The trial court found there was no surprise in the prosecution's request to admit the writings because "we did discuss the information." The record supports this finding. Trial counsel was on notice on November 9, 1995, that the prosecutor might introduce the writings but that nothing further would occur until they were translated.

Defendant makes much of the prosecutor's "I will pass" comment, arguing it revealed an intention to forgo admission of the writings. The trial court evidently understood the prosecutor's comment differently. When trial counsel objected on the same ground to the prosecutor's efforts to introduce the writings on Monday, November 13, the court recalled that the prosecutor had been undecided; the court had mentally noted the documents had not been translated, as would be necessary before they could be introduced. Even assuming the court's recollection of the November 9 discussion was inaccurate, counsel did nothing to correct the error. For these reasons, the court's finding that the prosecutor's request to introduce the exhibits was not a surprise was supported by substantial

evidence. The court's granting the prosecutor's renewed request to admit the writings on the following court day was not fundamentally unfair.

### 5. Asserted Bias in Evidentiary Rulings at the Competency Hearing

Defendant contends that the trial court's evidentiary rulings discussed above (pt. II.B.2.–.4., *ante*) demonstrated bias against her and in favor of the prosecution and violated her state and federal constitutional rights to due process. We reject the argument.

Defendant first complains that the court excluded portions of Dr. Kania's and Dr. Mills's testimony as a discovery sanction (pt. II.B.3., *ante*), but permitted the prosecution to introduce the writings seized from defendant's jail cell over defense objections the evidence was improper rebuttal evidence and untimely (pt. II.B.4., *ante*). Second, defendant asserts that the court treated the defense and the prosecutor differentially when it excluded the rebuttal testimony of defense expert Sherry Skidmore regarding professional standards governing forensic psychologists in a competency evaluation (pt. II.B.2., *ante*), but admitted the prosecution's surrebuttal evidence of defendant's writings, despite the prosecutor's assertedly misleading representation he would not use the writings (pt. II.B.4., *ante*).

Defendant forfeited the claim of bias by failing to raise it during the competency trial. (*People v. Pearson* (2013) 56 Cal.4th 393, 447; *People v. Guerra* (2006) 37 Cal.4th 1067, 1112 (*Guerra*).) The claim lacks merit in any event. " '[A] trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review.' " (*People v. Fuiava* (2012)

53 Cal.4th 622, 732, quoting *Guerra*, at p. 1112; cf. *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 795 ["There is no reason to explore the heart and mind of the [adjudicator] when effective relief is readily available if the reviewing court concludes a finding is unsupported by substantial evidence. To hold otherwise would encourage a losing party to raise the specter of bias indiscriminately[.]"].) Defendant fails to demonstrate that the court engaged in any judicial misconduct or exhibited bias, "let alone misconduct or bias that was 'so prejudicial that it deprived defendant of " 'a fair, as opposed to a perfect, trial.' " ' " (*People v. Avila* (2009) 46 Cal.4th 680, 696.)

### 6. *Rejection of Proposed Instruction*

Defendant asked the court to instruct the jury that if she were found incompetent, she would not be released from custody. The proposed instruction, which was patterned after CALJIC No. 4.01, stated in relevant part: "A verdict of 'incompetent to stand trial' does not mean the defendant will be released from custody. Instead, she will remain in confinement at a state hospital or another public or private institution for treatment of the mentally disordered until the court determines that she had [*sic*] regained her competence. [¶] Moreover, if and when the defendant is found to be competent, the criminal proceeding that was pending against her will be reinstituted. A finding by you, the jury, that the defendant is not competent to stand trial does not constitute the final disposition of the criminal case against her. Rather it will have the effect of postponing that case until she is deemed to be competent to assist in her own defense." The trial court refused to give the instruction.

On appeal, defendant contends that the court's refusal to instruct the jury on the consequences of a verdict of incompetence was erroneous because there was a risk that the jurors in her trial would assume she could be immediately released from custody were she found incompetent, and therefore might find her competent to prevent her return to the community. Defendant relies for her argument on *People v. Moore* (1985) 166 Cal.App.3d 540, in which the Court of Appeal held a defendant in a sanity trial is entitled upon request to an instruction advising the jury that a verdict of "not guilty by reason of insanity" does not mean the defendant will be released from custody. (*Id.* at p. 556.) The *Moore* court reasoned that because some jurors may be unaware of the consequences of an insanity verdict, the instruction is necessary to guard against the possibility that the jurors would find the defendant sane because they feared an insanity verdict would result in his release from custody. (*Ibid.*) Defendant argues that this case involved a similar risk that jurors unfamiliar with competency proceedings might have found her competent simply to prevent her release from custody and the indefinite abeyance of her criminal case. Defendant further contends that she was entitled to the proposed instruction under the due process clause of the Fourteenth Amendment. In support of the argument, defendant cites the high court's decision in *Simmons v. South Carolina* (1994) 512 U.S. 154, 168–169 (plur. opn. of Blackmun, J.) and its progeny, holding that, where future dangerousness is at issue, a capital defendant has a due process right to inform the jury that he or she will be ineligible for parole if sentenced to life imprisonment.

We have previously rejected arguments similar to defendant's, and do so again here. In *People v. Marks* (2003)

31 Cal.4th 197, for example, the defendant sought a similar instruction stating, in relevant part: " 'If the defendant is found mentally incompetent to stand trial, criminal proceedings shall remain suspended until such time as he becomes mentally competent. In the meantime, the court will order the defendant to be confined at a state hospital for the care and treatment of the mentally disordered where he will participate in a program designed to promote the defendant's speedy restoration to mental competence.' " (*Id.* at p. 221.) We upheld the trial court's refusal to give the instruction, explaining the instruction was flawed because it "characterized defendant's return to competence and the eventual resumption of criminal proceedings as inevitable," even though "there [is] no guarantee of a speedy recovery." (*Id.* at p. 222.) We "declined to extend *Moore* beyond its original context," i.e., sanity trials. (*Ibid.*)

Similarly, in *People v. Dunkle* (2005) 36 Cal.4th 861 (*Dunkle*), the defendant argued the trial court erred in failing to instruct the jury on its own motion regarding the consequences of a verdict of incompetence, also analogizing his case to *Moore*. We again "declined to apply *Moore* outside its original context." (*Id.* at p. 897.) We reasoned that "[b]ecause the outcome of any future efforts at restoring a defendant to competency is uncertain at the time when the jury must make its decision on competency, an instruction patterned after *Moore* and CALJIC No. 4.01 is necessarily speculative." (*Ibid.*)

Here, defendant's proposed instruction on the consequences of an incompetency verdict suffered from the same basic flaw. It speculates as to defendant's return to competence and resumption of criminal proceedings, matters that are inherently uncertain when the jury is determining competency. (Cf. *Jackson v. Superior Court* (2017) 4 Cal.5th 96, 100–102

[describing range of possible outcomes following a determination of incompetence].) The court did not err in refusing defendant's proposed instruction.

### 7. *Cumulative Error at Competency Trial*

Defendant contends her entire death judgment should be reversed based on the cumulative effect of the prejudice resulting from all of the asserted errors in her competency trial. We have found no prejudicial error. Where we have assumed the existence of error in the exclusion of portions of the Skidmore, Mills, and Kania testimony, we have concluded any error was harmless. Considered in combination, these assumed errors do not establish that defendant was denied a fair competency proceeding.

### 8. *Denial of Request for a Second Competency Trial*

Defendant contends that the court erred in denying her request for a second competency hearing under section 1368 based on her assertion that she was increasingly unable to understand and respond to the legal proceedings and to cooperate with trial counsel in preparing her defense. She also contends that the asserted error violated her state and federal constitutional rights to due process and a fair trial. We find no error.

### a. *Factual and procedural background*

As discussed above, on November 13, 1995, the jury returned its verdict finding defendant competent to stand trial in her criminal proceedings. On January 3, 1996, during a pretrial in camera hearing held outside the presence of the prosecutor, the court denied defendant's motion for substitution of defense counsel under *People v. Marsden* (1970) 2 Cal.3d 118. In the course of the proceeding, trial counsel declared a doubt

about defendant's competence and requested a second competency hearing under section 1368. Although counsel offered no new information in support of his request, the court suspended the criminal proceedings and appointed two psychiatrists to evaluate defendant's competence.

On January 5, 1996, during proceedings at which both parties were present, the court vacated its order appointing psychiatrists pursuant to section 1368. It explained: "I was somewhat taken aback by [trial counsel]'s further declaration as to the defendant's competency and forgot there was no District Attorney present, because we had a [*Marsden*] hearing prior to that, and I appointed doctors. But on reconsideration I think we need to have a little further information and showing before that can be done again." The court informed counsel it was relying on our decision in *People v. Medina* (1995) 11 Cal.4th 694 (*Medina II*), for its authority to reconsider its prior order appointing the psychiatrists. The court set the matter for a hearing to determine under *Medina II* whether there had been a "substantial change of circumstances" since the jury returned its verdict finding defendant was competent to stand trial.

At a hearing on January 19, 1996, trial counsel renewed his request for appointment of mental health experts under section 1368 to evaluate defendant's competence to stand trial. Counsel explained that his motion was based solely on new factual developments and not a new diagnosis. During the two conferences he had had with defendant since the jury had found her competent on November 13, 1995, counsel said, she spoke in a "rambling fashion" about her dissatisfaction with his representation. Although counsel tried to discuss the nature of her dissatisfaction and inform her of her options, she appeared to not understand his explanations. Counsel asserted that

defendant spoke no more than 10 words during the *Marsden* hearing[21] and that her conduct demonstrated a "deepened inability" to understand and respond to the legal proceedings and cooperate with counsel. In addition, after counsel informed her the District Attorney had filed a notice of intent to seek the death penalty, he questioned her to determine whether she understood the impact of the decision; she responded "with a blank stare."

The prosecutor argued that defendant's incoherence and inability to understand the issues had been litigated at the competency trial, and counsel had presented no grounds for a new referral under section 1368. Counsel acknowledged that the issues presented by his renewed motion were not different from those litigated at defendant's first competency trial, i.e., her confusion and inability to understand the legal proceedings and to cooperate with counsel, but he maintained defendant had become "more disorganized, incoherent, and uncooperative." The court denied the motion, finding counsel's showing insufficient to distinguish defendant's present condition from her condition before the competency trial.

### b. *Discussion*

" 'Once a defendant has been found competent to stand trial, a second competency hearing is required only if the

---

[21]     Actually, defendant spoke somewhat more than 10 words at the *Marsden* hearing. When defendant complained about counsel's representation, the court asked her to give examples. Defendant explained, "Okay. Sometimes I asked him, like, for small things that he is able to do. And he just cannot do them. Sometimes I ask him questions, and he never has an answer for them, you know. And the way he has handled the case since the beginning, I just don't like it. I don't agree with it."

evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence.'" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1415, quoting *Medina II, supra,* 11 Cal.4th at p. 734; see also *People v. Jones* (1991) 53 Cal.3d 1115, 1153.) "More is required than just bizarre actions or statements by the defendant to raise a doubt of competency" (*People v. Marshall* (1997) 15 Cal.4th 1, 33), or "counsel's unparticularized assertion that defendant's condition had deteriorated, with no explanation of how it had done so" (*Dunkle, supra,* 36 Cal.4th at p. 904).

We conclude the court did not err in denying defendant's motion for a new competency evaluation. Trial counsel offered only unparticularized assertions and brief descriptions of isolated incidents that, in his view, reflected a "deepening" of defendant's inability to understand the legal proceedings and cooperate with counsel. Defendant's behavior may, however, have simply been a display of her unwillingness to cooperate with counsel. (See, e.g., *Medina II, supra,* 11 Cal.4th at p. 735 [defendant's "cursing and disruptive actions displayed an unwillingness to assist in his defense, but did not necessarily bear on his *competence* to do so, or reflect a substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of the defendant's competence"].) In the absence of a more specific offer of proof, the trial court did not err in concluding that counsel had not presented evidence of changed circumstances or new evidence casting a serious doubt on the prior finding that defendant was competent to stand trial.

## III. CRIMINAL PROCEEDINGS

### A. Jury Selection Issues

Defendant contends that the trial court committed reversible error when it excused for cause two prospective jurors, B.R. and F.P., based solely on their written questionnaire answers concerning their personal views on the death penalty, in violation of her rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (See *Wainwright v. Witt* (1985) 469 U.S. 412; *People v. Stewart* (2004) 33 Cal.4th 425, 440–455 (*Stewart*).) In addition, defendant contends that the court erroneously excused for cause Prospective Juror R.J. after voir dire based on his death penalty views. We conclude that the court erred in excusing Prospective Juror B.R. for cause based solely on her questionnaire responses. Reversal of defendant's penalty judgment is mandated under United States Supreme Court precedent. (*Gray v. Mississippi* (1987) 481 U.S. 648, 659–667 (*Gray*).) In light of this conclusion, we need not decide whether the trial court erred in dismissing any of the remaining prospective jurors based on their death penalty views.

### 1. *The Jury Selection Procedure and Written Questionnaire*

Four panels of prospective jurors were called for selection of the jury in this case. After each panel was sworn, the court made its prefatory remarks and then screened prospective jurors for hardship excusals, almost all of which were resolved by stipulations of the parties. The remaining prospective jurors were instructed to complete the jury questionnaire in the jury assembly room and to return the following Monday.

The 32-page questionnaire contained 81 questions and included a section concerning the respondents' "Opinions about the Death Penalty." The introduction to this section explained that if the jury found defendant to be guilty and a special circumstance true, a penalty trial would be held; the jury would choose a penalty of life without the possibility of parole or death; and in making the penalty choice, the jury would consider factors in aggravation and mitigation.

On July 6, 1998, outside the presence of the prospective jurors, the court informed counsel that 122 prospective jurors with completed questionnaires were expected to arrive that morning for jury selection. The court had "identified approximately 29 potential jurors from the reading of the questionnaires, which in my mind, if their answers were consistent in open court with their answers in the questionnaire, I would in all probability excuse them for cause." The court asked the parties to consider excusing the 29 prospective jurors by stipulation because the courtroom could seat a maximum of only 92 individuals. In the alternative, the court proposed excusing the last 30 individuals from the random list of prospective jurors. The court expressed hope that "[we] can work through the obvious individuals to stipulate for cause."

The court and counsel thereafter discussed the qualifications of the 29 prospective jurors based solely on their written questionnaire responses, beginning with Prospective Juror B.R. When the court asked the parties for a response, trial counsel stated, "[W]e'll submit it. We can't stipulate to them obviously, Your Honor, but we know what the Court's concerns are." The prosecutor noted that B.R. was on his list of challenges for cause. Without further discussion, the court ruled, "Based on the answers that the potential juror would not vote for death,

and at this time [B.R.] would be excused for cause." No other cause for her excusal was identified.

Prospective Juror F.P. was another of the 29 prospective jurors the court identified as probably disqualified based on her written questionnaire responses alone. After the court and counsel discussed her responses, the prosecutor challenged F.P. for cause under *Witt*. The court granted the challenge.

The court subsequently conducted voir dire of the remaining prospective jurors in groups of 18. Each party was permitted 30 minutes to ask follow-up questions.

During the voir dire process, the court excused Prospective Juror R.J. for cause under *Witt*. The court did not permit counsel to attempt to rehabilitate any of the prospective jurors the court had determined to be disqualified as "substantially impaired." The parties exercised their for-cause and peremptory challenges, and the jury was sworn.

### 2. *Discussion*

"Under decisions of the United States Supreme Court, prospective jurors who express personal opposition to the death penalty are not automatically subject to excusal for cause as long as 'they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' (*Lockhart v. McCree* (1986) 476 U.S. 162, 176; see *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522.) To determine if a prospective juror is excusable for cause without compromising a defendant's constitutional rights, we inquire whether the prospective juror's views on the death penalty 'would "prevent or substantially impair the performance" ' of the juror's duties in accordance with the court's instructions and his or her oath." (*People v. Riccardi* (2012) 54 Cal.4th 758, 778 (*Riccardi*); see

*People v. Avila* (2006) 38 Cal.4th 491, 529 (*Avila*); *Stewart, supra*, 33 Cal.4th at pp. 446–447.)

"Before granting a challenge for cause, the 'court must have *sufficient information* regarding the prospective juror's state of mind to permit a *reliable* determination as to whether the juror's views would " 'prevent or substantially impair' " ' performance as a capital juror. [Citation.] Trial courts must therefore make 'a conscientious attempt to determine a prospective juror's views regarding capital punishment to ensure that any juror excused from jury service meets the constitutional standard.' " (*People v. Leon* (2015) 61 Cal.4th 569, 592; accord, *Covarrubias, supra*, 1 Cal.5th at p. 863.)

On appeal, we independently review a trial court's dismissal of a prospective juror under *Witt* based solely on his or her written questionnaire responses. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 37, citing *Riccardi, supra,* 54 Cal.4th at p. 779.) "[A] prospective juror may be discharged for cause solely on the basis of written questionnaire responses only if it is 'clear' from those responses that the juror is unable or unwilling to temporarily set aside the juror's beliefs and follow the law. ([*Riccardi*], *supra,* 54 Cal.4th at p. 781, fn. 11; [*Avila*], *supra,* 38 Cal.4th at p. 531; see also *People v. McKinnon* (2011) 52 Cal.4th 610, 647–648.) Where a prospective juror's written responses are ambiguous with respect to the individual's willingness or ability to follow the court's instructions in a potential penalty phase, the record does not support a challenge for cause. (*Stewart*, at pp. 448–449.)" (*Zaragoza, supra*, at pp. 38–39; see *Covarrubias, supra,* 1 Cal.5th at p. 863.)

Preliminarily, the Attorney General argues defendant forfeited her claim by failing to object to the dismissal of Prospective Juror B.R. or request voir dire. At the time of defendant's trial, however, there was no requirement of a contemporaneous objection or statement of grounds to preserve a claim of *Witherspoon / Witt* error in the excusal of a prospective juror.[22] (*McKinnon, supra,* 52 Cal.4th at p. 637.) Nor did counsel forfeit the issue by submitting the question to the trial court. (*Ibid.*; *People v. Lynch* (2010) 50 Cal.4th 693, 733.) We therefore proceed to the merits of defendant's claim.

In her questionnaire, Prospective Juror B.R. stated that she was a widowed 70-year-old retired payroll clerk and had been a resident of the city of Riverside for 42 years. B.R. estimated that she had worked on the questionnaire for an hour. Of the 81 questions contained in the questionnaire, B.R. left 36 questions unanswered.

In response to Question 15, Prospective Juror B.R. identified herself as a religious person and indicated that her religious beliefs would not prohibit or make it difficult for her to sit as a juror. The section entitled "The Charges Here" informed prospective jurors that defendant was charged with the murders of her three minor children by stabbing and with the special

---

[22] In *People v. McKinnon, supra,* 52 Cal.4th at page 643 (*McKinnon*), we overruled *People v. Velasquez* (1980) 26 Cal.3d 425, "to the extent it articulates a no-forfeiture rule with respect to *Witherspoon/Witt* excusal error" and prospectively held that in order to preserve a claim of such error for appeal, counsel—or defendant if proceeding pro se—"must make either a timely objection, or the functional equivalent of an objection, such as a statement of opposition or disagreement, to the excusal stating specific grounds under *Witherspoon/Witt.*"

circumstance of multiple murder. In response to Question 37 in that section, B.R. indicated by circling "yes" that she had a "religious or moral feeling that would make it difficult for her to sit in judgment of another person." B.R. did not have any feelings, positive or negative, about the criminal justice system.

The questions Prospective Juror B.R. left unanswered included the following: "Would you automatically reject the testimony of a witness who admitted that he/she had used drugs or alcohol?"; "What is your opinion, if any, of psychologists or psychiatrists who testify in criminal cases?"; "Do you have the opinion that any mother who kills her children must be 'crazy'?"; "Do you have any feeling about the nature of the charges in this case that would make it difficult or impossible for you to be fair or impartial?"; "Would you be reluctant to serve on a jury on a crime involving acts of violence and where graphic photographs of the victim will be in evidence?"; "Do you believe the criminal justice system makes it too hard for the police and prosecutors to convict people accused of crimes?"; and "If the judge gives you an instruction on the law that differs from your beliefs or opinions, will you follow the law at [*sic*] the judge instructs you?" She did not answer questions about her ability to follow instructions concerning the prosecution's burden of proof. She also failed to answer the following questions: "Would you believe or disbelieve the testimony of a law enforcement officer simply because he/she is a law enforcement officer?"; "Would you automatically believe everything an expert said merely because the person is called an expert?"; and "What is it about yourself that makes you feel you can be a fair and impartial juror?"

In the "Trial Issues" section of the questionnaire, Prospective Juror B.R. answered the following questions "unsure" instead of "yes" or "no": "Do you feel you can give the

defendant and the People a fair trial?"; "Can you objectively view and consider graphic photos of dead children?"; "[C]ould you listen to your fellow jurors and receive from them the benefit of their thinking concerning the evidence in this case?"; "If during jury deliberations . . . you become convinced that you are wrong, could you reconsider your position?"; and "Would you change your position merely because the other jurors disagree with you?"

Questions 68 through 73 and 76 through 78 of the questionnaire concerned a prospective juror's death penalty views and duties as a capital juror. In response to Question 68, which asked respondents to describe their "general feelings about the death penalty," B.R. wrote: "I wouldn't want to make that decision." In part "a" of Question 68, which asked prospective jurors to rank their feelings about the death penalty on a scale of 1 to 10, with 1 indicating "*strongly against* the death penalty" and 10 being "*strongly in favor* of the death penalty," B.R. ranked herself a "1."

In part "c" of Question 68, Prospective Juror B.R. circled "Yes" in response to the question, "If you are against the death penalty, would your opinion make it difficult for you to vote for the death penalty in this case, regardless of what the evidence was?" In Part "e" of the same question, B.R. indicated that she had never held a different opinion about the death penalty. In response to Question 73, "Do you have an opinion as to whether you think death or life in prison is the more severe punishment?," B.R. answered, "No." B.R. left unanswered the remaining death penalty questions. Among them was Question 70, which asked, in essence, whether, no matter what the evidence was, the prospective juror would "ALWAYS" vote for the death penalty (pt. (a)) or would "ALWAYS" vote for life

without possibility of parole (pt. (b)), or would consider all of the evidence and decide the appropriate penalty according to the law (pt. (c)).

Based on our independent review of the record, Prospective Juror B.R.'s written questionnaire responses, taken together, did not clearly demonstrate that her death penalty views would prevent or substantially impair her ability to serve as a capital juror in accordance with the trial court's instructions and her juror's oath. (*McKinnon*, *supra*, 52 Cal.4th at p. 647; *Avila*, *supra*, 38 Cal.4th at p. 533.) Crucially, B.R. indicated she "wouldn't *want*" to make a decision involving the death penalty, not that she could not or would not make such a decision if instructed to do so. B.R. also stated that her strongly held views against the death penalty would make it difficult to vote for the death penalty, but again, not that she could not or would not do so. Our cases make clear that "mere *difficulty* in imposing the death penalty does not, per se, prevent or substantially impair the performance of a juror's duties." (*Avila*, *supra*, at p. 530.) "A juror might find it very difficult to vote to impose *the death penalty*, and yet such a juror's performance still would not be substantially impaired under *Witt*, unless he or she were unwilling or unable to follow the trial court's instructions by weighing the aggravating and mitigating circumstances of the case and determining whether death is the appropriate penalty under the law." (*Stewart*, *supra*, 33 Cal.4th at p. 447.)

It is possible that Prospective Juror B.R.'s views might have been clearly revealed by her response to Question 70, which sought to determine whether prospective jurors would "always" vote for life imprisonment versus the death penalty. We have previously upheld the dismissal of jurors based on their written responses to questions that clearly ask whether the

"juror would automatically vote one way or the other irrespective of the evidence." (*People v. Wilson* (2008) 44 Cal.4th 758, 787 (*Wilson*) [questionnaire asking jurors whether, " '[n]o matter what the evidence was,' would they '<u>ALWAYS</u> vote for the death penalty' or 'for life without possibility of parole.' "]; see *id.* at pp. 788–789.) But B.R. did not respond to Question 70, and the remainder of her responses provided no sufficient basis to conclude that B.R. was "not willing or able to set aside . . . her personal views and follow the law." (*Id.* at p. 787.)

The Attorney General argues that even if counsel's failure to object to B.R.'s excusal did not result in forfeiture of the claim, counsel's decision to submit the matter provided support for the trial court's assessment that B.R. was excusable for cause under *Witt*. The Attorney General relies on *People v. Schmeck* (2005) 37 Cal.4th 240, 262 (*Schmeck*), in which we said trial counsel's submission of the question of a prospective juror's qualification to serve in a capital trial, like a failure to object, " 'does suggest counsel concurred in the assessment that the juror was excusable.' " (*Ibid.*, quoting *People v. Cleveland* (2004) 32 Cal.4th 704, 734–735.)

This case is distinguishable from *Schmeck*. In *Schmeck*, substantial evidence supported the trial court's finding, based on their voir dire responses and demeanor, that the prospective jurors in question were disqualified under *Witt*. "All four prospective jurors indicated at various points during their voir dire that, in light of their views concerning the death penalty . . . they were unable to state that they could consider imposing the death penalty in this case as a reasonable possibility." (*Schmeck, supra,* 37 Cal.4th at p. 262.) Here, by contrast, the court excused Prospective Juror B.R. based solely on her

68

questionnaire responses, finding she "would not vote for death." As explained above, however, the evidence before the court was insufficient to establish that B.R.'s death penalty views would prevent or substantially impair her performance as a capital juror. (*McKinnon, supra,* 52 Cal.4th at p. 643; *Avila, supra,* 38 Cal.4th at p. 531.) Moreover, during this portion of the jury selection process, the court did not permit the parties to attempt to rehabilitate any of the prospective jurors whom it had identified as excusable for cause. Under the circumstances, trial counsel's decision to submit B.R.'s excusal does not alter our conclusion that the excusal was improper.

This case is likewise distinguishable from *McKinnon,* in which trial counsel not only submitted the matter of prospective jurors' excusal for cause under *Witherspoon/Witt* based solely on their written questionnaire responses, but also declined the court's offer to conduct voir dire. (*McKinnon, supra,* 52 Cal.4th at p. 650.) In *McKinnon,* as in *Schmeck,* we reasoned that counsel's conduct "signaled concurrence" in the trial court's ruling; this concurrence, we said, "weigh[ed] heavily, along with the substance of [the] questionnaire responses, in favor of a determination on the merits that the excusal was proper." (*McKinnon,* at p. 650; see *id.* at p. 651.) In this case, as noted, trial counsel was not given the option of conducting voir dire. And more importantly, the substance of B.R.'s questionnaire responses—or nonresponses, as the case may be—did not clearly signal that B.R. held views about the death penalty that rendered her "unable to deliberate fairly on the issue of penalty." (*Id.* at p. 649.) Under the circumstances, even if we were to assume that counsel's submission of B.R.'s excusal indicated acquiescence in the court's ruling, it would not "weigh heavily" in favor of a finding that the ruling was proper. The trial court

erred in concluding B.R. was disqualified based solely on her written questionnaire responses; further inquiry was necessary to determine whether her death penalty views actually warranted excusal under *Witherspoon*/*Witt*.

The Attorney General raises an alternative ground for affirming the excusal: that B.R. failed to obey her juror oath and respond to all the questions in the questionnaire. But even assuming that we may affirm B.R.'s dismissal on a ground entirely different from the ground the trial court cited, we reject the Attorney General's argument. The clerk administered the following oath to each panel of prospective jurors: "You and each of you do understand and agree that you will accurately and truthfully answer under penalty of perjury all questions propounded to you concerning your qualifications and competency to serve as a trial juror in the matter now pending before this Court." In addition, after each panel was sworn, the trial court made its prefatory remarks and advised the prospective jurors of the importance of the juror questionnaire. It stated first the use of the questionnaire would "cut down the jury selection in this case by a number of days." It then informed the prospective jurors that "the attorneys will be reading the questionnaires in great depth because they will be utilizing that information to help them select the jury in this case." The "Instructions for Juror Questionnaire," appearing on the second page of the questionnaire, largely repeated the trial court's advisement of the questionnaire's dual purpose and specifically encouraged prospective jurors to provide complete answers. Critically, however, the written questionnaire instructions included the following additional advisement, which was not provided orally by the trial court: "If you cannot answer a question, please leave the response area blank. During the

questioning, you will be given an opportunity to explain or expand any answers if necessary."

The record does not reveal why Prospective Juror B.R. did not answer a substantial number of the questions on her questionnaire. She may have had difficulty answering the questions and reasonably relied on the above advisement on the questionnaire, with the expectation that when she and the other prospective jurors returned to court, the judge and attorneys would question her and give her an opportunity to explain her blank responses. Absent an explanation from B.R. as to why she failed to complete all of the questions, we cannot conclude she failed to obey her oath. The unanswered questions provided a reason for the trial court to voir dire B.R., but not justification to excuse her for cause. (See, e.g., *Wilson, supra*, 44 Cal.4th at p. 789 [a trial court should personally examine a prospective juror when it has "reason to suspect a prospective juror is a poor reader or may simply have misunderstood the questionnaire"].)

Having found error, we turn to the question of remedy. "The general rule is that, absent a showing of prejudice, an erroneous excusal of a prospective juror for cause does not mandate the reversal of judgment. This rule is based on the principle that a '[d]efendant has a right to jurors who are qualified and competent, not to any particular juror.' [Citation.] But . . . under existing United States Supreme Court precedent, the erroneous excusal of a prospective juror for cause based on that person's views concerning the death penalty *automatically* compels the reversal of the penalty phase without any inquiry as to whether the error actually prejudiced defendant's penalty determination. (*Gray, supra*, 481 U.S. at pp. 659–667 (opn. of the court); *id*., at pp. 667–668 (plur. opn. of Blackmun, J.); *id*., at p. 672 (conc. opn. of Powell, J.).)" (*Riccardi, supra*,

54 Cal.4th at p. 783; see *People v. Woodruff* (2018) 5 Cal.5th 697, 745.)  In accordance with this precedent, we must reverse the penalty judgment.[23]

## B.  Guilt Phase Issues

### 1.  Defendant's Motion for Self-Representation

Defendant argues that the trial court committed reversible error in denying her request for self-representation under *Faretta v. California* (1975) 422 U.S. 806.  The claim is without merit.

### a.  Factual and procedural background

On Monday, July 20, 1998, during the morning session on the second day of the prosecution's case-in-chief, the prosecutor played for the jury a portion of the audiotape of defendant's interview with San Jacinto Police Detective Frederick Rodriguez conducted on the day of the homicides.  Sometime after the morning recess, at lead defense counsel Jay Grossman's request, the trial court conducted an in camera hearing with only Grossman and cocounsel David Macher present.  Grossman informed the court that defendant was dissatisfied with counsel's representation and that he had

---

[23]    Defendant also contends that the court failed to make a case-specific determination concerning whether group voir dire was practicable, in violation of Code of Civil Procedure section 223, and failed to conduct a voir dire adequate to identify prospective jurors who could not be impartial.  As a result, defendant contends, she was denied a fair and impartial jury at the penalty phase in violation of article I, section 16 of the state Constitution and the Sixth and Fourteenth Amendments to the federal Constitution.  Because we conclude the penalty judgment must be reversed due to *Witherspoon/Witt* error, we need not address this contention.

explained her options, one of which was to request self-representation under *Faretta v. California, supra,* 422 U.S. 806 (*Faretta*). Grossman had mentioned the option of self-representation because "the things that she's asking us to do, while not unethical, are simply not in her best interest." Defendant told counsel that she "wanted to represent herself and wanted to talk with the Court." Grossman added, "this is a continuing problem [that is] exacerbated every day when there's more testimony." Cocounsel Macher stated he would object to a *Faretta* motion as untimely and not in defendant's best interest. The court indicated it would allow defendant to be heard on her request later that day. After the hearing concluded, the remainder of the audiotape of defendant's police interview was played to the jury.

During the lunch recess, the court held a hearing under *Marsden* and *Faretta.* Lead counsel Grossman informed the court that, while the audiotape was being played before the jury that morning, defendant mentioned for the first time that she believed the voice on the audiotape of her police interview was not hers. Grossman and cocounsel Macher later met with defendant in a holding cell. According to Grossman, defendant told them that the audiotape was a fraud, that the prosecution was trying to frame her for the murders, and that she expected her attorneys to call witnesses to prove the audiotape was a fraud.

Grossman informed the court: "I have no such witnesses and there's never been a suggestion that that is not her voice on the tape. And we tried to explain that to [defendant]. She then said that if we wouldn't do it, basically it was her intention to do it by way of either testifying or managing the case on her own." Grossman continued: "[W]e have no witnesses who can contest

73

the validity of that tape. I don't know who to call, no provisions have been made to do that because, frankly, there was never any expectation that this wasn't her voice on the tape. [¶] And I tried to talk to [defendant] about . . . recognizing her voice. I know I'm not a witness, but the information that was . . . being conveyed in that tape is of the nature that I told her I would find hard to believe a jury would believe the San Jacinto Police were getting somebody to invent the names of the children, the ages, the history with her husband, things like that. [¶] [Defendant]'s very adamant that it's a fraud and insists that we go forward in some way to prove that it's a fraud, and . . . this is another instance, in her own mind, that indicates to her that counsel is not making an effort to try to protect her legal rights and advance her interests in this case."

Grossman explained to the court it would be "the worst possible thing" for the defense to present evidence that the prosecution framed defendant for the murders and to also argue "the DNA and other things have all been fabricated." According to counsel, as of that morning, defendant was "adamant" that "she wanted to at least explore this issue with the Court, and again indicate her dissatisfaction to the Court."

Defendant told the court that she had never heard the audiotape of her interview with Detective Rodriguez before it was played for the jury. Lead counsel Grossman informed the court: "We have dealt with the tape issue, at least the statement issues, before, although I don't recall ever playing portions of the tape to her in . . . jail. We did have the transcript, but it never was brought to my attention that this was a fabrication."

The court asked defendant whether she was requesting to represent herself, and she answered, "Yes." The court noted

that lead counsel Grossman had been assigned to defendant's case for two years, and the prosecution was "halfway" through the presentation of evidence in its case-in-chief. The court also stated that earlier that morning, it had overheard defendant yelling at both her attorneys in a "very raised, angry voice" in a holding cell directly adjacent to the courtroom, and asked Grossman, "Is that a very fair characterization?" Grossman answered, "Generally, yes."

The court asked Grossman what his "take on this" was, and counsel said he believed defendant's concern "is not one of delay[;] her concern in her own mind is presenting what she considers the true facts to be to this jury." Grossman stated that defendant had expressed no desire for a continuance, but essentially insisted that he call witnesses he did not have in order to dispute the accuracy of the audiotape of defendant's police interview. Grossman expressed frustration "that we are almost at total loggerheads, 'we' meaning [defense counsel], with [defendant] . . . . And there's a widening gulf between what she wants and what we can ethically do and what we think is in her best interests in terms of possible penalty in this case."

Cocounsel Macher added that after working on defendant's case for two years, he considered her defense theories "implausible," "fantasy," and "just not based in reality." Macher stated he could not present defendant's theories in good faith because her defense "would be a disaster for both guilt and penalty, and we can't do it." The following colloquy then occurred:

"THE COURT: So we have a clear record, in your opinion the defense that she wants presented, which she would like to present on her own behalf, is one, in part, based upon fantasy?

"MR. MACHER:  Your honor, from what we've been able to see in two years of working on the case, I would agree that it's just not based in reality.

"THE COURT:  All right.  [Defendant], are you telling me you want to represent yourself today; is that what you're saying?

"[DEFENDANT]:  Yes, Your Honor.

"THE COURT:  And how do you plan on doing that?

"[DEFENDANT]:  As I have already seen how Mr. Macher conducted the cross-examination of Officer Blane Dillon, and there's questions that could have been asked direct to him in regards to the timing, that he made like from San Jacinto Police Station to the apartments.  [¶]  And there's a couple questions that we already have reports on that we could compare his answers with, because those reports are dated October 27th, 1994.  They're very accurate.

"THE COURT:  All right.  And you're telling me that you are—you feel that you are competent to proceed today, without any further delay, in representing yourself?

"[DEFENDANT]:  From what I see in the way they have conducted the case, yes, I think so.  I think I would be.

"THE COURT:  All right.  The Court is well aware of the admonition pursuant to *Faretta* and the right to self-representation.  [¶]  And Mr. Grossman, I don't think I am even going to go into it that far and advise her of the consequences of self-representation and the detriments thereto.  Obviously this is a death penalty case, [defendant] knows that, and she would not be given any special consideration.  [¶]  I'm not going to voir dire her on that because . . . in my view of the situation, her conduct today at this late stage is either an obstructionist tactic

or one of delay. It's tardy. [¶] [Defense counsel] have been on this case for many, many, many months, and we're halfway through the prosecution's case. And based upon the *Marsden* request that got this far, and based upon her attitude that she displayed to you in the holding cell today, that I overheard, as far as the raised voices—and again, I didn't hear what she said, I just heard her yelling at you—and her demeanor and manner during the *Marsden* hearing, it's clear to me that that request for self-representation is not in good faith, and I feel that it is one to obstruct these proceedings and it is untimely. And that request is . . . denied."[24]

### b. *Prior* Marsden *hearings*

On May 20, 1996, defense conflict panel attorneys Jay Grossman and Frank Peasley were appointed to represent defendant; thereafter, conflict attorney David Macher substituted for Frank Peasley. Defendant made four unsuccessful attempts under *Marsden* to substitute appointed counsel Grossman and Macher at the in camera hearings held on April 2, May 4, July 14, and July 16, 1998.[25]

### i. *April 2 hearing*

At the April 2, 1998, *Marsden* hearing, the trial court addressed defendant's letter to the court expressing her

---

[24]   We presume the trial court was referring to defendant's *Marsden* motion that it heard and denied on July 16, 1998, the court day immediately preceding the current *Faretta* hearing. We discuss this hearing below.

[25]   These hearings were held before two different judges: The Honorable Vilia G. Sherman conducted the trial proceedings until she recused herself on June 16, 1998. Thereafter, the Honorable Patrick F. Magers conducted defendant's trial.

concerns about the defense DNA testing and the possibility that samples were lost when the DNA facility that conducted the analyses relocated its laboratory. Based on counsel Macher's representation that no DNA samples were lost during the move, the trial court found that defendant had a misunderstanding about the samples and "no grounds here for a *Marsden* motion."

When the trial court asked defendant if she had anything else to call to the court's attention, defendant answered that she believed the contents of police reports she possessed contained errors. The trial court explained to defendant that she should discuss her concerns with her attorneys. Lead counsel Grossman informed the trial court that defendant and counsel had differences with respect to defense strategy and trial tactics, including whom to subpoena as witnesses. Counsel said that he suspected that prior counsel had similar problems with defendant and that prior to trial the issue of "who is in charge of the trial, the attorneys or [defendant]" will have to be resolved.

The trial court informed defendant that "[t]he law is that the attorneys have the last word on everything to do with tactics and strategy." Defendant told the court, "I'm not dissatisfied with [her attorneys], and I do not have a conflict with them." She added, "All I really want is on the record two or three of the [police] reports. That's about it. That is what I'm asking for." Because defendant did not have the reports with her at the hearing, the trial court agreed to talk with her about them at the next proceeding.

### ii. May 4 hearing

At counsel Macher's request, the trial court held a *Marsden* hearing to address counsel's concern that after he and lead counsel Grossman met for hours with defendant, she voiced

"substantial dissatisfaction" with counsel, which "carried over" to that morning's proceedings. Macher explained that although he and Grossman reviewed the evidence with defendant more than once and explained their defense theory, defendant told them that she would prepare her own defense. Neither Grossman nor Macher believed the theory defendant wanted to present was "based upon any factual matters whatsoever." Macher further informed the trial court that defendant said she would be ready to proceed "this morning." Both Grossman and Macher believed that any *Faretta* request was untimely and believed defendant's dissatisfaction related to how counsel planned to conduct the defense rather than a breakdown in the attorney-client relationship.

Defendant said that she was "somewhat dissatisfied" with defense counsel because apparently none of the defense witnesses included those whom she suggested. When the court asked defendant whether she wanted new attorneys or to represent herself, defendant answered, "No. Well, I'm just explaining the reason as to why I am somewhat dissatisfied." Defendant also stated that she planned to meet with current counsel in the upcoming week to discuss her concerns and asked, "[C]an I ask the Court if I can hold my decision to see if I want a new counsel or not until Thursday after I speak to them?" When the court asked for her to clarify what she was asking, defendant stated, "Just for four days to find out if I will remain with them, stay with them until the proceedings start, until the trial, whatever." The court explained that it was presently conducting pretrial motions and that "[t]oday's the date set for trial." Macher expressed concern that defendant might not have understood that if she waited to bring a *Faretta* motion until after she met with counsel during the week, which would occur

after trial commenced, that the motion would be untimely.  The following colloquy ensued:

"THE COURT:  Well, I was about to take that up with her, but I'm not clear on exactly what it is she's asking for, to keep you until she hires somebody else or to represent herself in trial.

So, [defendant], do you want to act as your own attorney and cross-examine witnesses and conduct the trial and call experts and be responsible for getting witnesses here and, in other words, do everything that Mr. Macher and Mr. Grossman are doing for you now?  Is that what you're asking?

"[DEFENDANT]:  Well, from the place that I am at it's pretty hard for me to bring witnesses in.

"THE COURT:  Exactly.  [¶]  So are you asking me to replace Mr. Grossman and Mr. Macher with other attorneys?  Is that what you're asking?

"[DEFENDANT]:  No.  I was just asking for a little time, but if you say we already start trial today—

"THE COURT:  All right.  A little time for what?

"[DEFENDANT]:  To speak to them and show them a couple of defense points that they could use.

"THE COURT:  Well, I think that you will be speaking to them a great deal during this trial, and I'm sure they'll be listening to you and the things you want them to do.  They may not necessarily agree with you, and as your expert lawyers, it's up to them to decide how to conduct the case.  You need to understand that.

"[DEFENDANT]: Oh, okay.  Okay."

Before the trial court made its findings, Macher added that he and lead counsel Grossman reviewed a list of eight

potential witnesses whom defendant identified as "very important" to her defense but found none relevant to any potential guilty phase issues. Macher also informed the court that defendant's theory "makes no legal sense and we cannot pursue it" and that the views he expressed would not change before he and Grossman next met with her. Defendant told the trial court that she understood all that Macher had said.

The trial court ruled, "To the extent that this was a *Marsden* motion, which I don't believe it was in the true essence of the word, the motion is denied." The court found no breakdown in the attorney-client relationship, because it found defendant would have the same complaints with "any other attorneys." Next, the trial court ruled that it "[didn't] truly believe" defendant was making a *Faretta* motion; in the alternative, any *Faretta* motion was untimely.

### iii.  July 14 hearing

At defendant's request, the trial court conducted a *Marsden* hearing. Defendant repeated her concerns about lost DNA samples, specific DNA tests, and the list of individuals she wanted counsel to call to testify on her behalf. Cocounsel Macher reported that defendant "has been consistently confused despite our repeated explanations regarding the purported lost DNA." He explained that "DNA evidence has never been lost in this case either by the government or by the defense team" and that the defense previously litigated all DNA issues, which were preserved for appeal. In addition, Macher, Grossman, and the defense investigator met "face-to-face" with defendant for two hours at the beginning of May to review her list of potential witnesses and unanimously agreed that none of the witnesses would be relevant to the guilt phase defense. Having found no

grounds for substitution of counsel, the trial court denied the *Marsden* motion.

### iv.  *July 16 hearing*

On the first day of the prosecution's case-in-chief, after the prosecution's second witness was excused, and out of the presence of the jury, lead counsel Grossman informed the trial court that he wanted to address a "*Marsden* issue."  When Grossman asked the prosecutor to leave (so the trial court could conduct a confidential *Marsden* hearing), defendant said she wanted him to stay.  The trial court cleared the courtroom of everyone except defendant and her counsel.  Grossman informed the trial court that during trial, defendant expressed dissatisfaction "with the defense efforts in this case."  Grossman then stated, "Apparently, part of her complaint is that she wants to tell [the prosecutor] that he knows she's innocent and is prosecuting her improperly.  I said, I didn't think that was a wise thing for her to tell him because, in my opinion, I don't think he believes that."

Defendant repeated her concerns about the DNA testing and specifically that her attorneys did not dispute the DNA testing results with their own defense expert.  Macher informed the trial court that the DNA admissibility issues had been litigated before and decided by Judge Sherman and were preserved for appeal.  Defendant then complained, "It appears pretty unfair that the DA has so much proof.  It's like me being denied the access to an expert."  Grossman then explained that "[defendant]'s problem is that she feels that we should have the laboratory that did the analysis for us come to court.  [¶]  The problem is that their analysis in many ways is the same, as harmful as, or more harmful as the state laboratory.  And I tried

to explain to her this morning, there's no sense calling somebody that hurts us." Grossman and Macher made a tactical decision to not present the defense DNA test results.

The trial court asked defendant if she had anything further, and she stated, "I just don't agree with the way they are conducting the whole entire case. The way they are handling my case." The trial court ruled, "The *Marsden* request, if that's a *Marsden* request, it will be denied."

### c. *Discussion*

Defendant contends the court erred in denying her midtrial request for self-representation under *Faretta, supra,* 422 U.S. 806. We find no error.

In *Faretta, supra,* 422 U.S. 806, the United States Supreme Court held that the Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves. Following *Faretta*, in *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*), this court considered questions concerning the timing of a defendant's self-representation request. We held that "in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." (*Id.* at pp. 127–128.) Otherwise, "once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court." (*Id.* at p. 128; accord, e.g., *People v. Bradford* (1997) 15 Cal.4th 1229, 1365 ["[A]lthough in a criminal trial a defendant has a federal constitutional, unconditional right of

self-representation, in order to invoke that right, he or she must make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial."].)[26]

We have held that "timeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made. An analysis based on these considerations is in accord with the purpose of the timeliness requirement, which is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.'" (*People v. Lynch, supra*, 50 Cal.4th at p. 724.) In exercising its discretion to grant or deny an untimely self-representation request, we have held the trial court should consider, among other factors, "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra*, 19 Cal.3d at p. 128.) When a court denies an untimely request,

---

[26] After defendant's trial, the United States Supreme Court held in *Indiana v. Edwards* (2008) 554 U.S. 164, 174–178, that a defendant may be denied the right to self-representation if he or she, although competent to stand trial, suffers from a severe mental illness and is unable to conduct trial proceedings without assistance of counsel. In *People v. Johnson* (2012) 53 Cal.4th 519, 527–530, we adopted the *Edwards* standard for competence to represent oneself at trial. This case, however, presents no issue under *Edwards* or *Johnson*; neither the court nor the parties addressed the question of defendant's mental condition in connection with her *Faretta* motion.

its ruling is reviewed for abuse of discretion. (See *People v. Valdez* (2004) 32 Cal.4th 73, 103 (*Valdez*).)

Defendant does not dispute that whether to grant an untimely *Faretta* motion is addressed to the trial court's discretion. But she argues that the only factor the trial court may properly consider is the potential for delay or other disruption resulting from the granting of the motion. She argues *Windham* was wrong to permit courts to consider other factors—an error, she contends, that is traceable to a mistaken assumption that the self-representation right evaporates once trial has begun. We agree with defendant that the potential for delay and disruption is an important factor in the analysis, but we disagree that it is the only factor the court may consider. We see no reason why a court may not also consider, for example, whether the potential disruption is likely to be aggravated, mitigated, or justified by the surrounding circumstances, including the quality of counsel's representation to that point, the reasons the defendant gives for the request, and the defendant's proclivity for substituting counsel. (See *Windham*, *supra,* 19 Cal.3d at p. 128.) Defendant cites no authority, and we are aware of none, to suggest that these considerations are impermissible under *Faretta.*

Here, defendant made her request on the second day of the prosecution's case-in-chief and approximately two years after lead counsel Grossman and cocounsel Macher were appointed to represent her. The request was untimely under *Windham*. (See *Valdez, supra,* 32 Cal.4th at p. 102 [*Faretta* motion made "moments before jury selection was set to begin" was untimely]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110–1111 (*Horton*) [defendant's motion for self-representation was untimely when made on the date scheduled for trial after numerous

85

continuances]; *People v. Frierson* (1991) 53 Cal.3d 730, 742 [defendant's request for self-representation was untimely when made on the eve of trial, over 10 months after appointment of trial counsel]; *People v. Burton* (1989) 48 Cal.3d 843, 853 [defendant's *Faretta* request was untimely when made "after the case had been called for trial, both counsel had answered ready, and the case had been transferred to a trial department for pretrial motions and jury trial" and jury selection was to commence the next day]; cf. *Avila v. Roe* (9th Cir. 2002) 298 F.3d 750, 753 [a *Faretta* request is timely if made before jury is empaneled, unless it is shown to be for the purpose of delay].)

Defendant argues that her delay in requesting self-representation was justified because she had not heard the audiotape of her interview with Detective Rodriguez until the prosecutor played it for the jury. She asserts that she had no prior opportunity to discuss its authenticity with counsel. Lead counsel Grossman, however, informed the trial court that he previously reviewed the transcript of the statements on the audiotape with defendant in her jail cell and that she had never previously complained that the audiotape was a fabrication. If defendant believed that any statements were falsely attributed to her, she had prior opportunity to inform counsel of her concern that the police and prosecution fabricated the audiotape. Defendant's delay was not justified on this ground.

Because defendant's *Faretta* request was untimely, we must consider whether the court abused its discretion in denying the request. No abuse of discretion has been shown. The source of defendant's dissatisfaction with her attorneys was their unwillingness to make unsupported attacks on the prosecution case that in their professional judgment would have been contrary to their client's interests. Defendant had

previously expressed similarly unfounded complaints about counsel and sought their replacement. Although defendant did not explicitly request a continuance if she took on her own defense, and asserted she "th[ought]" she was "competent" to take over her defense immediately, the defense she apparently intended to take on—attempting to show that the tape of her police interview had been fabricated—would by its nature involve delay to investigate and secure witnesses. The trial court reasonably concluded that defendant's midtrial *Faretta* request was made for purposes of disruption or delay and that it would indeed have that effect. Considering these circumstances, the court did not abuse its discretion. (See *Valdez, supra*, 32 Cal.4th at p. 103; *Horton, supra*, 11 Cal.4th at pp. 1110–1111; *People v. Burton, supra*, 48 Cal.3d at pp. 853–854; *Windham, supra*, 19 Cal.3d at pp. 129–130.)

### 2. *Jury Instructions on the Degree of Murder and on Motive*

Defendant contends that the trial court's instructions to the jury on doubt as to the degree of murder (CALJIC No. 8.71), unanimity as to first or second degree murder (CALJIC No. 8.74), and motive (CALJIC No. 2.51) were flawed and diluted the prosecution's burden of proof. CALJIC Nos. 8.71 and 8.74, she contends, were confusing and ambiguous regarding the degree of murder, and CALJIC No. 2.51 permitted the jury to find guilt based on motive alone and also placed a burden of proving innocence on the defense. Defendant argues that these instructional errors require reversal of her death judgment.

As an initial matter, the Attorney General contends defendant has forfeited these issues by failing to object to the challenged instructions at trial. We agree in part. In general, a defendant may raise for the first time on appeal instructional

error affecting his or her substantial rights. (Pen. Code, § 1259; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34.) But "[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Here, defendant's claim that CALJIC No. 2.51 improperly permitted the jury to find her guilty based on evidence of motive alone is forfeited because, at bottom, it is an argument that the instruction was incomplete. Defendant was obligated to request a clarifying instruction and failed to do so, thereby forfeiting her appellate challenge. (*Guerra, supra*, 37 Cal.4th at p. 1134.) Her other claims, asserting the instructions were incorrect, are reviewable despite the lack of an objection below. (*People v. Gamache* (2010) 48 Cal.4th 347, 375, fn. 13.) In any event, all of the claims fail on the merits.

### a. CALJIC Nos. 8.71 and 8.74

Since defendant's trial, we have twice addressed troublesome language in the 1996 revised version of CALJIC No. 8.71 given in this case. (*People v. Salazar* (2016) 63 Cal.4th 214, 246–248 (*Salazar*); *People v. Moore* (2011) 51 Cal.4th 386, 410–411 (*Moore*).) As given here, the instruction told the jury, "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the

second degree."[27]   As we have acknowledged, the references to unanimity in this instruction are potentially confusing in light of their apparent contradiction of other instructions that correctly inform the jury that it must unanimously *acquit* the defendant of the greater offense before it may render a verdict on a lesser included offense.  We have concluded, however, that in light of the totality of the instructions there is no reasonable likelihood any confusion created by CALJIC No. 8.71 could be detrimental to the defendant.  "If anything, [this instruction] skewed the deliberations in [defendant's] favor.  [It] could reasonably be understood to tell the jurors that if they all agreed there was reasonable doubt as to the degree of the crime, because some jurors were not convinced, then defendant was entitled to the benefit of the doubt and a verdict of the lesser offense."  (*Salazar, supra,* 63 Cal.4th at p. 247.)  We reach the same conclusion in this case.

Like the defendants in *Moore* and *Salazar,* defendant also argues that CALJIC No. 8.71 could have misled some jurors into believing they were foreclosed from giving her the "benefit of the doubt" if other jurors were convinced beyond a reasonable doubt that she was guilty of first degree murder.  The unconvinced jurors, defendant argues, would conclude from the unanimity language in the instruction that they could not give her the benefit of the doubt because not *all* jurors were unsure of the degree of the murder, and therefore the jurors with a doubt would be required to vote for first degree murder.  This argument also fails.  As we explained in *Salazar,* "No logical

---

[27]   The trial court did not give the jury the concluding bracketed portion of the pattern instruction, which read "as well as a verdict of not guilty of murder in the first degree."

reading of the instructions leads to a compelled verdict of first degree murder." (*Salazar*, *supra*, 63 Cal.4th at p. 247.)

Viewing the jury instructions as a whole, as we must (*People v. Huggins* (2006) 38 Cal.4th 175, 192), we conclude the jurors would have understood that they must be individually convinced of defendant's guilt beyond a reasonable doubt before convicting her of first degree murder. (See CALJIC Nos. 8.74 [requiring a jury to unanimously agree on the degree of murder before returning a murder verdict]; 17.40 [requiring a juror to make an individual decision and not decide a question by merely following the majority vote]; 17.43 [directing the jury to address any question during deliberation to the trial court]; and 8.30 [instructing the jury that unpremeditated second degree murder was an intentional unlawful killing with malice aforethought "but the evidence is insufficient to prove deliberation and premeditation"].) Any jurors who might personally have been persuaded to give defendant the benefit of the doubt regarding the degree of murder when other jurors had concluded she was guilty of first degree murder would have understood that they could *not* properly vote to convict her of first degree murder because, in their view, the prosecution had not proven her guilt of that offense beyond a reasonable doubt. (See also *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1262–1263 [instruction nearly identical to CALJIC No. 2.02, which was given in this case, provided adequate benefit-of-the-doubt instruction under *People v. Dewberry* (1959) 51 Cal.2d 548, 555–557]; *People v. Friend* (2009) 47 Cal.4th 1, 55 [despite the trial court's failure to give CALJIC No. 8.71, in light of the giving of CALJIC Nos. 8.79 and 17.10, among others, the jury was adequately instructed on the *Dewberry* benefit-of-the-doubt principle].) In the scenario defendant envisions, a jury's reasonable understanding of the

instructions as a whole would result in a hung jury, not a directed verdict for first degree murder, as she appears to argue.

Defendant lastly contends that CALJIC No. 8.74, which told the jury it "must agree unanimously as to whether she is guilty of murder of the first degree or murder of the second degree" before returning a verdict, was flawed because it did not clarify the confusion caused by giving CALJIC No. 8.71, nor did it mention the requirement to find the degree of murder beyond a reasonable doubt.[28] As a result, she argues, CALJIC No. 8.74 diluted the prosecution's burden of proof. We disagree. As we have explained, CALJIC No. 8.71 is a benefit-of-the-doubt instruction concerning the role of the *juror's individual judgment* in deciding between first and second degree murder. (*Moore, supra*, 51 Cal.4th at p. 411.) CALJIC No. 8.74 properly instructed the jurors on returning a verdict. Specifically, the instruction correctly informed the jurors that if they unanimously found defendant guilty of murder, they had to unanimously agree on the degree of the murder before returning a verdict.

Nothing in CALJIC No. 8.74 contradicted other instructions clarifying the requirement that the jurors determine whether the prosecution proved defendant's guilt of first degree or second degree murder beyond a reasonable doubt. Jurors were instructed that the presumption of innocence places on the prosecutor "the burden of proving [defendant] guilty

---

[28] CALJIC No. 8.74, as given in its entirety, provided: "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you should find her guilty of an unlawful killing, you must agree unanimously as to whether she is guilty of murder of the first degree or murder of the second degree."

beyond a reasonable doubt" (CALJIC No. 2.90) of "the crime of murder" (CALJIC No. 8.10). CALJIC No. 8.70 instructed the jury that if it found defendant guilty of murder, it had to decide whether the murder was "of the first or second degree." The jurors were instructed on the elements of first degree murder (CALJIC Nos. 8.11, 8.20) and second degree murder (CALJIC Nos. 8.30, 8.31). Finally, the jurors were instructed under CALJIC No. 2.01 (sufficiency of circumstantial evidence) that each fact on which an inference of guilt rests must be proved beyond a reasonable doubt. We presume jurors understand and follow the instructions they are given, including the written instructions. (*Wilson*, *supra*, 44 Cal.4th at p. 803.) There is no likelihood the jurors misinterpreted the instructions concerning the prosecutor's burden of proving first degree or second degree murder in a manner that violated defendant's constitutional rights.

### b. CALJIC No. 2.51

Defendant contends that the trial court's instruction on motive under CALJIC No. 2.51[29] improperly allowed the jury to find her guilty based on motive alone and shifted to her the burden of proving an absence of motive in order to establish her innocence, thereby undermining the prosecution's burden of proof. We have previously rejected these claims (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 191), and defendant provides no persuasive reason to revisit that conclusion.

---

[29] CALJIC No. 2.51 states: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty."

### 3. *Superfluous Multiple-Murder Special-Circumstance Findings*

Citing *People v. Halvorsen* (2007) 42 Cal.4th 379, 422, defendant correctly notes that two of the three multiple-murder special-circumstance allegations were erroneously charged and found true in this case. "In numerous cases involving the same kind of error, we have stricken the superfluous finding[s] and concluded the defendant suffered no prejudice. [Citations.]" (*Ibid.*) We do so again in this case.

## C. Penalty Phase Issues

Defendant raises several claims of error at the penalty trial. Because we conclude the penalty judgment must be reversed for *Witherspoon/Witt* error, we do not address these claims. (See *Riccardi*, *supra*, 54 Cal.4th at p. 839.)

## IV. DISPOSITION

We affirm the judgment as to guilt, vacate two of the three multiple-murder special-circumstance findings, reverse the judgment as to the sentence of death, and remand the matter for a new penalty determination.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**MAURO, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Buenrostro
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S073823
**Date Filed:** December 3, 2018
_____

**Court:** Superior
**County:** Riverside
**Judge:** Patrick F. Magers

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Nina Rivkind, Nina Wilder and Arcelia Hurtado, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Annie Featherman Fraser, Felicity Senoski and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nina Wilder
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9211